# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-01767-SCT

*SHARON LYNNE ARMSTRONG MORRIS*

*v.*

*JOEY FRANKLIN MORRIS*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/1999 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN V. HUNTER, IV |
| ATTORNEYS FOR APPELLEE: | DEBRA D. P. BRANAN |
| | KELLY HAGAN SMITH |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 04/12/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/3/2001 |

**BEFORE PITTMAN, C.J., SMITH AND EASLEY, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This case comes before this Court on appeal by Sharon Lynne Armstrong-Morris ("Sharon"), defendant in the court below. This matter encompassed a complaint for divorce on the grounds of adultery, habitual cruel and inhuman treatment, and in the alternative, irreconcilable differences. The plaintiff, Joey Franklin Morris ("Joey"), also requested relief for related matters, including, without limitation, custody of three minor children. Sharon appeals the granting of and grounds for divorce, as well as the analysis of the *Albright* factors against her in the trial court below. Finding that there is no evidence that the chancellor's findings are clearly erroneous or that an erroneous legal standard was applied, we affirm the judgment of the chancery court.

## PROCEDURAL HISTORY

¶2. On January 18, 1999, Joey, filed a complaint for divorce from Sharon in the Chancery Court of DeSoto County, Mississippi. On February 1, 1999, the parties entered into a consent order as to temporary matters. On February 17, 1999, Sharon, by and through her counsel, M. Darin Vance, filed her answer to complaint for divorce and counter-complaint for divorce. On February 17, 1999, M. Darin Vance filed his motion to allow attorney to withdraw, and the court below granted that motion on February 22, 1999. John V. Hunter IV entered his appearance as Sharon's counsel on April 5, 1999.

¶3. This case was tried before Honorable Percy Lee Lynchard, Jr. on June 9, 1999. The court issued its opinion on September 13, 1999, and on September 22, 1999, entered a decree of divorce in favor of Joey and against Sharon on the ground of cruel and inhuman treatment. Joey received sole legal and physical custody of the minor children, subject to visitation rights of Sharon in accordance with specific visitation schedule, said visitation to be supervised by the father (Joey) or an agreed third party.

¶4. On October 1, 1999, Sharon timely filed a motion for new trial. This motion asserted, inter alia, that the chancery court erred in excluding from its consideration the deposition testimony of Edwina Hackett, Sharon's therapist from 1996 until the present. The court denied the motion on October 11, 1999. On October 21, 1999, Sharon filed a timely notice of appeal from the trial court's (1) evidentiary rulings at trial to Sharon's substantial prejudice; (2) findings of fact; (3) conclusions of law; (4) final decree, including, but not limited to, the restrictions placed upon Sharon's visitation with her minor children; (5) award of attorney's fees to plaintiff; and (6) denial of her motion for a new trial.

## FACTS

¶5. Joey and Sharon married on August 8, 1981, in Memphis, Shelby County, Tennessee. They lived together as husband and wife until or about December 31, 1998, at which time they separated in Southaven, DeSoto County, Mississippi. The parties had three children together, namely Mallory Simone Morris, a female child born November 5, 1988; Amanda Marie Morris, a female child born March 2, 1990, and Andrew Stephen Morris, a male child born September 29, 1992.

¶6. Sharon was the primary caregiver for Mallory, Amanda, and Andrew throughout her marriage to Joey. Sharon adjusted her schedule at work so that she could take the children and pick them up at school. Sharon also took the children to activities outside of school, including tap and ballet classes, gymnastics, Girl Scouts, and baseball. During their marriage, Sharon and Joey both were equally active in taking the children to church and Sunday school.

¶7. In her testimony, Sharon revealed that she is a 36-year-old registered surgical nurse with a salary of approximately $24 per hour working 30 hours a week. Joey is employed with Quebecor, Inc., making $15.67 per hour. He was forced to seek bankruptcy protection approximately two years ago because of debts largely incurred as a result of medical expenses for his wife.

¶8. Each party claims acts of violence by the other during the marriage. Sharon alleges that Joey physically abused her on several occasions. In the summer of 1986, Joey shoved Sharon into the bathtub. Joey admits he did shove her that night. He was angry because she came home with hickeys on her neck, and she had an affair that night with a man she met at a bar. There is some dispute as to whether Sharon actually did have sexual relations with a man from a bar. In her journal she describes in detail the events of that night, even admitting that she had sex with a stranger. Later in her testimony, however, she retracted that admission insofar as the sex was concerned. Sharon claims that on another occasion, Joey choked Sharon, leaving fingerprints on her neck. However, Sharon admitted hitting Joey with a phone during that incident. Joey testified that he did not remember grabbing or choking her at all, but that they did push each other. Sharon further admitted at testimony that she hit Joey with an iron on another occasion. Also, evidence indicates that Sharon told her doctor that she had homicidal thoughts of killing her husband.

¶9. Sharon further contends that throughout their marriage, Joey mentally abused her. When Sharon and Joey had problems conceiving, Joey repeatedly threatened to divorce Sharon and marry a real woman who could have his children. Sharon, however, also insulted Joey. When they discovered that Joey's low sperm count was the reason that she and Joey had not been able to conceive, Sharon told Joey that she would divorce him and marry a real man.

¶10. Sharon also claims that Joey forced her to have sex against her will throughout the marriage. In her

testimony, she stated that Joey initiated sexual intercourse or other sexual relations with Sharon while she was asleep. Sharon stated in her testimony that she was forced to hide while changing her clothes in order to prevent Joey from touching her or initiating unwanted sexual contact with her. Joey, however, contends that every time he had sex with Sharon, it was consensual.

¶11. During Sharon's pregnancy with Amanda, Sharon's physician cautioned the couple that Joey was not to engage in unprotected sex because of the danger that such unprotected sex could cause Sharon to experience premature labor. Despite such warning, Sharon alleges that Joey forced or coerced her to engage in unprotected sex approximately once a week during her pregnancy with Amanda which caused Sharon to experience premature labor on thirteen or fourteen different occasions. On several occasions, Sharon was admitted to the hospital and was given the drug Terbutaline to stop her premature labor. In his testimony, Joey denied forcing Sharon to have unprotected sex during her pregnancy. Although there is no record of the thirteen or fourteen occasions of premature labor, Sharon's attorney proffered a nursing record from one time that Sharon went into premature labor.

¶12. It seems clear that Sharon experienced difficulties with sexual relations with her husband throughout the marriage. As a result of what Sharon indicates was Joey's ongoing insistence on sex on demand, Sharon testified that "[i]t ended up getting to the point where I didn't want him [Joey] to touch me, to look at me." On several occasions during one of her pregnancies, Sharon even told her husband that sex with him is like what it must be like to be raped.

¶13. Throughout her life, Sharon has experienced numerous mental and emotional problems. During the marriage, she experienced periods of confusion, panic attacks, blackouts, and depression. Sharon has attempted suicide on at least two occasions. On one occasion, she stole from the hospital where she worked the prescription medication to stop her heartbeat. Sharon readily admitted during her questioning that she even had a "suicide kit" which she kept at home. Further, she has engaged in self-mutilation, resulting in severe scarring of her limbs. She testified that on two separate occasions she awoke with "will to die" and "no way out" carved on her legs, with no memory of having performed this act. These self-mutilation acts occurred in the family home when the children were present. In an effort to prevent these actions, Joey would search the house for hidden blades, as well as remove the locks from inside the doors. Additionally, Sharon's living will stated the following telling words:

> My body is to be cremated and under no circumstances will there be a grave site to mourn. Celebrate my life, my freedom, my happiness. Never mourn my death. It is something I've waited for all my life.

In addition to having suicidal thoughts, Sharon has further revealed thoughts of killing Joey and her mother.

¶14. Sharon has been hospitalized for psychological problems several times. At the time of trial, she had been prescribed and was taking three medications for depression and anxiety. Further, she has experienced hallucinations and extreme paranoia. Joey testified that on several occasions when they would be in bed together, Sharon would be talking to her grandfather or claim her grandfather was at the end of the bed talking to her. According to Joey, another time when the children were present, Sharon claimed they had been followed. When Joey got out of the van to investigate, no one was in the parking lot, but Sharon continued to scream for the person to get away from her. Also, Sharon revealed urges to throw Andrew, her son, over the balcony. Sharon further had problems with blackouts where she did not know how to get home and would not recognize her husband and children. At the time of trial, Sharon continued to be under psychological care.

¶15. The record indicates that such problems with the sexual relationship of marriage, as well as her mental problems, likely stem from Sharon's sexual abuse by her grandfather from the ages of 8 to 12. As far fetched as it might seem, Sharon also admits a history of satanic cult involvement. Her involvement in the cult, according to her, was at the insistence of her grandfather. This involvement included group sex, animal sacrifices, cannibalism, and perhaps causing the death of at least one individual. Sharon was also raped once in her adult life by a former patient. In her deposition, Sharon's therapist, Edwina Hackett, stated that in her professional opinion, women who have been the victim of rape or sexual abuse "frequently do not enjoy sex with men." Shortly after Sharon and Joey were married, Sharon told Joey that she believed that she should be with a woman instead of a man.

¶16. During the course of the marriage, Sharon became involved in an extra-marital relationship with Ms. Brandy Schroyer. The relationship became sexual in nature in or before December of 1998. This relationship resulted in Sharon proclaiming her love for Brandy to Joey. Sharon openly engaged in this extra-marital relationship which resulted in upsetting the minor children and her husband. The court below found this relationship caused the final separation of the parties. The parties separated on or about December 31, 1998. At the time of trial, Sharon lived with Brandy and her two sons. Sharon has expressed that she intends to remain in this relationship indefinitely. At the onset of trial, Sharon's lover was also married.

¶17. Aggrieved, the Sharon appeals to this Court and assigns the following issues as error:

> **I. WHETHER THE CHANCELLOR ERRED BY AWARDING A DIVORCE TO JOEY FROM SHARON ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT?**
>
> **II. WHETHER THE CHANCELLOR ERRED IN EXCLUDING THE DEPOSITION TESTIMONY OF EDWINA HACKETT, SHARON'S THERAPIST?**
>
> **III. WHETHER THE CHANCELLOR ERRED IN HIS ANALYSIS OF THE *ALBRIGHT* FACTORS?**

## STANDARD OF REVIEW

¶18. This Court has repeatedly stated that it will examine the record and accept the evidence reasonably tending to support the findings made below, along with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact. *In re Estate of Taylor v. Thompson*, 609 So.2d 390, 392 (Miss. 1992); *Williams v. Evans*, 547 So.2d 54, 58 (Miss. 1989); *Clark v. Myrick*, 523 So.2d 79, 81 (Miss. 1988). The chancery court sitting as the trier of fact has the primary authority and responsibility to assess the credibility of witnesses. *Bryan v. Holzer*, 589 So.2d 684, 659 (Miss. 1991). Moreover, where we find substantial evidence in the record supporting the findings of fact, we will seldom reverse, whether those findings be of ultimate fact or evidentiary fact. *Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss. 1987). Put another way, unless the chancellor's determination of fact in a divorce case is manifestly wrong, this Court will uphold the chancellor's decision. *See Dillon v. Dillon*, 498 So.2d 328, 329 (Miss. 1986).

¶19. As this Court has stated, these standards are general and elusive of precise meaning and application, and this Court has struggled to articulate precisely what is meant. *See Thompson*, 609 So.2d at 392. The

Court has held that the findings of a chancellor are upheld unless those findings are clearly erroneous or an erroneous legal standard was applied. ***Hill v. Southeastern Floor Covering Co.***, 596 So.2d 874, 877 (Miss. 1992). Furthermore, this Court has held that a finding of fact is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made." ***Thompson***, 609 So.2d at 392 (quoting ***UHS-Qualicare v. Gulf Coast Community Hosp., Inc***., 525 So.2d 746, 754 (Miss. 1987)).

## ANALYSIS

### I.

¶20. Joey filed for divorce on the grounds of adultery, habitual cruel and inhuman treatment, and, in the alternative, irreconcilable differences pursuant to Miss Code Ann § § 93-5-1 & -2 (1994). As support for these grounds, Joey alleged the actions of (1) Sharon's self-mutilation and suicide attempts, (2) making him fearful of hurting his children, (3) her relationship with Brandy Schroyer, and (4) statements that she did not love him. Sharon counterclaimed on the grounds of habitual cruel and inhuman treatment and in the alternative, irreconcilable differences. After a trial on the merits of the case, the chancery court granted the divorce to Joey on the ground of habitual cruel and inhuman treatment based on the continuous open relationship between Sharon and Brandy.

¶21. This Court has held the following:

> The ground for habitual cruel and inhuman treatment may be established by a preponderance of the evidence, rather than clear and convincing evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." ***Smith v. Smith***, 614 So.2d 394, 396 (Miss. 1993)(quoting ***Wires v. Wires***, 297 So.2d 900, 902 (Miss. 1974)).

***Daigle v. Daigle***, 626 So.2d 140, 144 (Miss. 1993). This Court has held that it no longer requires that a specific act must be the proximate cause of a separation before a divorce may be granted on grounds of habitual cruel and inhuman treatment. ***Robison v. Robison***, 722 So.2d 601, 603 (Miss. 1998) (citing ***Bias v. Bias***, 493 So.2d 342, 345 (Miss. 1986)); ***Richard v. Richard***, 711 So.2d 884, 890 (Miss. 1998). Instead, the conduct both before and after the separation may be considered in determining whether sufficient evidence was presented to support the chancellor's award of divorce upon grounds of habitual cruel and inhuman treatment. ***Robison***, 722 So.2d at 603; ***Richard***, 711 So.2d at 890.

¶22. We have further held:

> Evidence sufficient to establish habitual, cruel and inhuman treatment should prove conduct that: either ***endanger[s] life, limb, or health, or create[s] a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief*** or, in the alternative, be so ***unnatural and infamous as to make the marriage revolting to the offending[ed] spouse*** and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance.

***Rawson v. Buta***, 609 So.2d 426, 431 (Miss. 1992) (citations omitted) (emphasis added). Our cases require more than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the ground of cruel and inhuman treatment. ***Brooks v. Brooks***, 652 So.2d 1113, 1124 (Miss. 1995). Personal violence is not required to constitute cruel and inhuman treatment. *See **Pierce v. Pierce***, 38 So. 46 (Miss.

1905). This Court has further held that the impact on the plaintiff caused by the other spouse is crucial; thus, we employ a subjective standard. *See Faries v. Faries*, 607 So.2d 1204, 1209 (Miss. 1992).

¶23. Sharon relies on *Bowen v. Bowen*, 688 So.2d 1374 (Miss. 1997), for her contention that the chancellor should not have awarded the divorce to Joey based on the ground of habitual cruel and inhuman treatment simply because she was engaged in a homosexual relationship with another woman. In *Bowen*, both parties filed for divorce on the ground of habitual cruel and inhuman treatment. *Id*. at 1376. The chancellor denied a divorce to either party, and the wife appealed. *Id.* In *Bowen*, rumors and speculation were rampant in the parties' community that Mrs. Bowen was a lesbian, that she was engaged in a homosexual affair with another woman, and that Mrs. Bowen never denied being a lesbian and refused to break off her relationship with the woman in order to prevent her family from being embarrassed by the rumors. *Id.* at 1376-77. In *Bowen*, this Court held that the evidence did not establish habitual cruel and inhuman treatment. *Id.* at 1380.

¶24. As Joey accurately points out, although *Bowen* is a case that concerns a divorce and allegations similar to the ones in this case that the wife was engaged in a homosexual affair, it is easily distinguishable from the case sub judice. Unlike in the case at bar, the Court in *Bowen* was not called upon to determine whether such evidence as self-mutilation, recurring attempts at suicide, blackouts, hallucinations, and engaging in a lesbian affair constituted cruel and inhuman treatment. Indeed, the *Bowen* Court affirmed the chancellor's finding that the problems with the Bowens was mere incompatibility. *Id.* at 1380. The case at bar contains findings that indicate much more than mere incompatibility. Therefore, *Bowen* can easily be distinguished from the case presently before the Court.

¶25. Joey relies on *Robison v. Robison*, 722 So.2d 601 (Miss. 1998), for support that an extra-marital relationship could be used to support a charge of habitual cruel and inhuman treatment. In *Robison*, this Court addressed the issue of whether sufficient evidence was produced to support the granting of divorce on habitual cruel and inhuman treatment to the wife when the evidence indicated that the husband engaged in sexual relations with women at work, moved in with his girlfriend, and neglected his family. *Id.* at 603.

¶26. The facts in *Robison* are applicable to the case at bar. As in the case before the Court at present, the chancellor in *Robison* declined to decide the case on grounds of adultery, and instead, used the extra-marital relationship to support the habitual cruel and inhuman treatment charge. *Id.* at 602. In both *Robison* and in the present case, the parties were involved in open relationships with at least one third party. *Id.* at 602. Both cases further incorporate other evidence, in addition to extra-marital affairs, to support the charge of habitual cruel and inhuman treatment. The husband in *Robison* neglected his family to the point that they could not afford groceries, and the wife's co-workers had to hold a food drive for her. *Id.* at 603. As a result of her husband's neglect, criticism, and affairs, the wife in *Robison* was treated for depression and anxiety. *Id.* The Court found that the husband's neglect, combined with his verbal and emotional abuse toward his wife which resulted in her needing treatment for depression, was sufficient to support a finding of habitual cruel and inhuman treatment. *Id.* Similarly, in the case at bar, Joey testified that his wife's behavior and actions have caused him to seek counseling. Additionally, as a result of having to pay his wife's bills for her stays at various hospital for her psychological problems, Joey was forced to file bankruptcy. Additionally, Joey has had problems collecting child support from Sharon.

¶27. The only case where this Court has specifically held that a homosexual affair, by itself, constituted habitual cruel and inhuman treatment was in the 1905 case of *Crutcher v. Crutcher*, 86 Miss, 231, 38 So.

337 (1905). In that case, the Court held that the crime of pederasty (improper intimacy with male sex) is cruel and inhuman treatment within the meaning of the divorce statutes. Specifically, the Court applied the following reasoning, "[u]nnatural practices of the kind charged here are an infamous indignity to the wife, and which would make the marriage relation so revolting to her that it would become impossible for her to discharge the duties of wife, and would defeat the whole purpose of the relation." *Id.* at 337.

¶28. This Court affirms the chancellor's granting the divorce on the ground of habitual cruel and inhuman treatment. However, such a ground for divorce should be granted due to the combination of factors that (1) endanger life, limb, or health of Joey and render the relationship unsafe both for himself and for his children, and (2) conduct that is unnatural and infamous as to make the marriage revolting. As the facts so indicate, Sharon has a history of violence and homicidal thought towards her husband, as well as numerous mental and emotional problems. As this Court has stated, impact of the conduct on the plaintiff is crucial. *Fairies*, 607 So.2d 1209. Following *Robison*, it seems clear that a combination of continuing course of conduct and actions exhibited by Sharon have contributed to making Joey's life, and that of his children, in danger, as well as making the marriage a sham and the marital relation revolting.

¶29. The record indicates several incidents of violence by Sharon throughout the marriage. She admitted hitting Joey with a phone. Also, further testimony by Sharon revealed that she hit Joey with an iron on another occasion. Other evidence in the record indicates that Sharon had homicidal thoughts of killing her husband and mother.

¶30. Although the tendency towards physical acts of violence by Sharon is certainly disturbing, it is the repeated evidence in this case that this woman is severely and emotionally disturbed that renders this an excellent case on the facts in which to grant a divorce on the ground of habitual cruel and inhuman treatment. Joey withstood years of trauma in his marriage as he tried to help his wife cope with her various mental problems and limit the effect of such mental disturbance on his children. Sharon attempted suicide on at least two occasions, and on one occasion she stole medication from the hospital in order to stop her heartbeat. Disturbing both to this Court and to Joey was the fact that Sharon is a self-mutilator, and performs such acts in the family home when her children and husband are present. Sharon has been hospitalized as a result of her psychological problems on multiple occasions. As a result of her chronic medical needs and the large costs involved, Joey was forced to file bankruptcy. Moreover, in addition to her depression, Sharon was also prone to blackouts, paranoia, and hallucinations, even to the extent that she had urges to throw her son over the balcony and would not recognize her children and husband.

¶31. It is particularly telling that when asked to tell the trial court why Sharon should be guilty of cruel and inhuman treatment, Joey responded with the following:

Cutting herself quite often, wanting to kill herself, having an affair with Brandy Schroyer, telling me about it, saying, you know, she saw nothing wrong with it, cutting herself with my children present in the house, making myself fearful that she'd hurt my kids, too, in the process.

In sum, the combination of acts of violence, mental problems, and the extra-marital affair with Brandy leads this Court to affirm the chancellor's grant of a divorce to Joey from Sharon on the ground of habitual cruel and inhuman treatment.

¶32. As a result of the above discussion, Sharon's argument that she is entitled to divorce on the ground of habitual cruel and inhuman treatment due to (1) forced sex during pregnancy and sex on demand; (2) other

physical abuse; (3) mental abuse, can be summarily dismissed. From the overwhelming evidence in the record, it is clear that Sharon Morris is a disturbed woman. It is equally clear that much of her emotional problems stem from the fact that she was sexually abused as a child by her grandfather, allegedly forced to participate in group sex during Satanic cult rituals, and raped as an adult. Clearly, this is a woman who views the sexual relations between a husband and wife as a constant reminder of past trauma.

¶33. In the record, it is simply Sharon's word that Joey forced her to have sex against Joey's denial that they never had sexual relations against her will. It is for the chancellor, not this Court, to assess such facts. While Joey did admit to having unprotected sex on at least two occasions during pregnancy, there was no evidence that the unprotected sex actually caused her to go into labor just because they occurred in close proximity. In fact, Sharon produced no medical records supporting such sex as the cause of the labor. Although there is evidence that Joey did push Sharon on one or two occasions, there is also evidence that Sharon exhibited violent tendencies towards Joey. Additionally, Sharon alleges that Joey subjected her to mental abuse by making such statements concerning her inability to conceive and having an affair with a woman. Sharon, however, also admitted making a statement to Joey about him being the reason they were having problems conceiving, as well as the fact that she was the one having an affair.

¶34. Although it does seem apparent that neither party in this marriage was innocent of wrongdoing, the "habitual" cruel and inhuman conduct clearly was conduct by Sharon. The accusations and proof thereof standing alone are extreme enough to constitute cruel and inhuman treatment against Joey. Moreover, when all things complained of are viewed as a whole, keeping in mind the habitual nature of the facts, the acts by Sharon certainly amount to habitual cruel and inhuman treatment.

## II.

¶35. In its decree of divorce, the chancery court ordered, "[i]n order to avoid harm to the children, visitation to be exercised by the Defendant/natural mother shall be exercised only during the day and at times in which the Plaintiff and natural father shall be present." Such a restriction was based upon the chancellor's findings that throughout Sharon's life, she has experienced numerous mental and emotional problems, and such psychological problems provide the court concern with respect to her abilities to care for the children. Sharon alleges such findings are tainted by the chancellor's refusal to consider the expert testimony of Sharon's therapist, Edwina Hackett. Hackett is a licensed social worker not a psychologist or psychiatrist.

¶36. On May 13, 1999, Hackett, practicing in Memphis, Tennessee, was deposed in this matter concerning her treatment of Sharon from 1996 to the present. Joey was represented at the taking of the deposition by counsel. The chancellor considered testimony about Sharon's mental health from both parties, from the lay witness Donna Olds, and from the lay witness Brandy Schroyer. There is evidence, however, that indicates that the chancellor refused to consider the deposition of Hackett when it was proffered at the hearing in this matter, and when Sharon moved for a new trial on the ground that the court had failed to consider Hackett's testimony.

¶37. We have repeatedly stated that the admissibility of evidence rests within the trial court's discretion. *Hall v. State*, 611 So.2d 915, 918 (Miss. 1993); *Wade v. State*, 583 So.2d 965, 967 (Miss. 1991). Unless judicial discretion is abused, the Supreme Court of Mississippi will not reverse his ruling. *Hall*, 611 So.2d at 918 (citing *Lewis v. State*, 573 So.2d 719, 722 (Miss. 1990)). Whether or not an individual is qualified as an expert in a field of scientific knowledge is within the trial judge's discretion. *Hall*, at 918. The

judge's determination on the issue will not be reversed unless it clearly appears that the witness is not qualified. *Id.* (citing *Wilson v. State*, 574 So.2d 1324, 1334 (Miss. 1990); *Smith v. State*, 530 So.2d 155, 162 (Miss. 1988)).

¶38. Sharon contends that the chancellor committed manifest error by his refusal to allow Hackett to be qualified as an expert witness. Sharon's counsel stated, "within that meaning of that rule of evidence, I would offer her testimony as expert testimony as a licensed professional within the state of Tennessee." The chancellor's reasoning for denying the use of Hackett's deposition is clear:

> I cannot accept her [Hackett's] testimony as an expert unless she is qualified even though, of course, the deposition was taken. I strongly question whether or not a licensed social worker like Ms. Branan just said could be qualified as an expert, but be that as it may, without that predicate being laid, I can't allow her [Sharon Morris] to read any opinion testimony from that deposition.

It is this Court's view that the chancellor was correct in determining that Hackett's deposition testimony could not be used without the proper predicate being laid. The test for expert testimony is clearly enumerated:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion of otherwise.

Miss. R. Evid. 702. In the case at bar, Sharon simply did not identify Hackett as an expert or qualify her as an expert to give an opinion as required under Miss. R. Evid. 702.

¶39. Hackett was not listed as an expert by Sharon in discovery responses. Trial by ambush cannot be condoned by this Court, nor can this Court find abuse of discretion by the chancellor when Sharon did not give advance notice that she intended to call Hackett as a witness and qualify her as an expert in a specific field. Indeed, in response to interrogatories, Sharon's attorney only listed one expert witness, Dr. Phillip Cooker.

¶40. Also, in her briefs, Sharon refers to the deposition testimony of Hackett as if she has been qualified as an expert. Neither at trial, nor in her briefs has Sharon stated in what precise area Hackett should be qualified as an expert. The fact that she gave testimony and the deposition was taken does not make her an expert, nor does it put her in a position to give an opinion unless Sharon's attorney was able to lay the proper predicate and qualify her as an expert. Sharon's counsel at trial admitted that he could not "sit here and qualify her as an expert because she is not here today."

¶41. The trial judge has discretion over whether or not a witness is qualified as an expert. *Hall,* 611 So.2d at 918. The chancellor was not presented with the qualifications of Hackett, or the precise area of expertise in which Sharon wanted her qualified. There is simply no evidence that the exclusion of the deposition of Edwina Hackett, a licensed social worker, resulted in prejudice to Sharon or would have resulted in a different result. Clearly, even if the chancellor erred in not allowing the deposition into evidence, which we find he did not, it would have been harmless error as there is no indication that admitting the deposition into evidence would have changed the outcome of this case. In sum, with all the questions left open regarding Hackett, combined with the fact that she was not listed as an expert witness in discovery responses, nor present at trial, it cannot be said that the chancellor abused his discretion in not qualifying her as an expert.

## III.

¶42. The standard of review this Court invokes in a child custody case is well-settled. The review is "quite limited in that the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this court to reverse." *Wright v. Stanley*, 700 So.2d 274, 280 (Miss. 1997) (citing *Williams v. Williams*, 656 So.2d 325, 330 (Miss. 1995)). This Court will not disturb the findings of a chancellor when supported by substantial evidence in the record. *Smith v. Jones*, 654 So.2d 480, 485 (Miss. 1995).

¶43. In all child custody cases, the polestar consideration is the best interest of the child. *Sellers v. Sellers*, 638 So.2d 481, 485 (Miss. 1994). In making a child custody determination, it is well-settled law that the trial court is to consider several facts which include: age of the children; health and sex of the children; which parent had the continuity of care prior to the separation; which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; employment of the parents and their responsibilities in that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness if parents; the home, school, and community record of the child; the preference of the child if sufficient age; stability of home environment and employment of each parent; and other relevant factors. *Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983).

¶44. In its opinion, the trial court clearly set out the *Albright* factors and applied the relevant facts to the factors. The chancellor followed the guidelines set out in *Albright* and accordingly resolved the custody issue in favor of the best interest of the children. Sharon contends that the chancellor erred in his analysis of the *Albright* factors (1) by resolving the factor of moral fitness against Sharon because of her relationship with another woman and (2) by refusing to consider the testimony of Sharon's therapist concerning Sharon's mental health in his analysis of the factor of the mental health of the parents.

### A. Whether the chancellor erred in resolving the factor of moral fitness against Sharon noting her homosexual relationship?

¶45. In his analysis of the moral fitness of the parents, the chancellor stated, "[b]y engaging in a homosexual relationship which this Court finds to be violative of Mississippi statutes, and continuing in that relationship at this time, the Court finds that the element of moral fitness must be resolved against the natural mother." As a basis for his reasoning, the chancellor cited *Weigand v. Houghton*, 730 So.2d 581 (Miss. 1999).

¶46. In *Weigand*, the father was an openly admitted homosexual who was engaged in a relationship with another man. *Id.* at 586. The lower court determined the factor of morality against the father based on his homosexual lifestyle. *Id.* This Court affirmed the lower court's analysis of the factor and stated, "[al]though the morality of David's [father's] lifestyle was one important factor to consider in the eyes of the Chancellor, *this was not the sole basis for his custody decision*."*Id.* at 586-87 (emphasis added).

¶47. This Court has clearly held that the chancellor can consider a homosexual lifestyle as a factor relevant in the custody determination of the child, as long as it is not the sole factor. Sharon's extra-marital affair with Brandy was not the only factor considered by the chancellor in making his determination that the best interest of the children was for them to be in the custody of the father. The chancellor also considered the following: the children's age and health; the fact that due to the emotional problems of Sharon, evidence indicated that the continuity of care was largely exhibited by the father; although both parents took active role in rearing the children, the emotional problems of the mother inhibited her ability to care for the children;

both parents exhibited willingness to care for the children; both parents have stable employment; mental and emotional problems of the mother caused the chancellor great concern; nothing to indicate that either party loves the children more than the other or that the children love one parent more than the other; both parties have seen fit to involve the children in community activities; children are not at an age to make a preference; the father continues to live with the children in the marital home, while the mother resides with her homosexual lover who herself remains married at this time. In making his custody determination in the case sub judice, the chancellor thoroughly discussed the *Albright* factors. He applied the evidence before him and there is nothing to support an allegation that his result was manifestly wrong or clearly erroneous as required by *Wright*.

### B. Whether the chancellor erred by refusing to consider the testimony of Sharon's therapist concerning Sharon's mental health in his analysis of the factor of the mental health of the parents?

¶48. In his analysis of the *Albright* factor of physical and mental health of the parents, the chancellor observed that "the mental and emotional problems suffered by the Defendant [Sharon] give this court great concern with respect to her ability to care for the children." Sharon alleges that the chancellor committed error by stating concern over Sharon's mental and emotional problems when evaluating the *Albright* factors. Essentially, she makes the exact same argument as seen in issue II herein above. Therefore, as this issue has already been discussed and dismissed, it is unnecessary to repeat the discussion. In short, the chancellor had plenty of evidence in the record on which to base his concern over the children's best interest. Sharon admitted a history of mental problems, Joey reaffirmed such problems, and Donna Olds and Brandy Schroyer testified to knowing of Sharon's psychological difficulties.

### CONCLUSION

¶49. This Court affirms the chancery court. Sharon first argues against the granting of the divorce to Joey rather than to Sharon. Specifically, she alleges that she should be granted the divorce based on the same ground due to miscellaneous allegations. The combination of acts of violence, mental problems, and the extra-marital affair leads this Court to affirm the chancellor's grant of divorce to Joey from Sharon on the ground of habitual cruel and inhuman treatment. Although we affirm the chancellor's opinion and ground for divorce, it is on different reasoning. Second, the chancellor did not err in excluding the deposition testimony of Edwina Hackett, the licensed social worker. There is no indication that the chancellor abused his discretion in excluding Hackett's deposition or in refusing to admit her as an expert witness. Third, the chancellor did not commit error in his analysis of the *Albright* factors in determining child custody. In conclusion, this Court upholds the chancellor's decision because there is no evidence that the chancellor's findings are clearly erroneous or that an erroneous legal standard was applied. The judgment of the DeSoto County Chancery Court is affirmed.

¶50. **AFFIRMED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**