824 So.2d 652 (2002)
Sharon Denise TURNER, Appellant,
v.
Mark TURNER, Appellee.
No. 2001-CA-00952-COA.
Court of Appeals of Mississippi.
August 20, 2002.
*654 Gary L. Roberts, Pascagoula, for Appellant.
Calvin D. Taylor, Pascagoula, for Appellee.
Before SOUTHWICK, P.J., LEE, AND MYERS, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. Sharon Denise Turner and Mark Turner were granted an irreconcilable differences divorce. Mr. Turner was awarded physical custody of the couple's five-year old son. Mrs. Turner appeals the judgment of the chancery court, arguing that the chancellor's analysis on the custody issue was erroneous. We disagree and affirm.

STATEMENT OF FACTS
¶ 2. Mark and Sharon Turner were married in 1989. The couple had one child, Alex, who was born in 1995. The couple separated when Alex was four years old. Mrs. Turner initially filed for a divorce; ultimately the parties agreed on a divorce based on irreconcilable differences.
¶ 3. Both spouses testified at the evidentiary hearing that was held. That testimony which is relevant to this appeal will later be summarized as needed. On February 1, 2001, the chancellor entered his written findings of fact and conclusions of law. The only issue raised on appeal by Mrs. Turner is that awarding custody of Alex to his father was error.

DISCUSSION
¶ 4. Mrs. Turner argues that the chancellor's analysis on the custody issue was erroneous. The Supreme Court has required that chancellors place on the record their findings as to each of ten factors first identified in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). These factors begin as suggested considerations but are now the sine qua non of all custody decisions.
(1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.
¶ 5. Our review of the chancellor's decision is limited. Morris v. Morris, 783 So.2d 681, 692 (Miss.2001). We will only reverse the chancellor's decision where it is manifestly wrong, clearly erroneous, or arrived at by application of an erroneous legal standard. Morris, 783 So.2d at 692.
¶ 6. We will not review each of the considerations that were necessary for the chancellor's review, but only those about which Mrs. Turner alleges error.

1. Continuity of Care/Best Parenting Skills
¶ 7. The chancellor in his findings of fact and conclusions of law grouped two of the Albright factors under "primary caretaker prior to separation." The chancellor's discussion makes it apparent that *655 he was considering the second and third issue in the Albright list of continuity of care and parenting skills. The chancellor found that this combined factor weighed in favor of Mr. Turner.
¶ 8. Mrs. Turner alleges that the chancellor did not address the parenting skill factor at all. She notes that "it might be argued" that the chancellor did this under the heading that we just described, but calls such as assumption "speculative." That the chancellor must dutifully address each factor has been made clear in such recent opinions as Powell v. Ayars, 792 So.2d 240, 244-45 (Miss.2001). In that case, the chancellor discussed specifically only two of the Albright factors. Powell, 792 So.2d at 244. The Supreme Court stated that since it would not "attempt to correspond the Albright factors to the evidence found within the record, we remand so the chancellor may make findings on each applicable Albright factor." Id. at 244-45.[1]
¶ 9. Unlike Powell, where the chancellor made no findings on the record as to eight of the ten Albright factors, we are presented here with extensive and detailed findings by the chancellor. The chancellor enumerated ten factors, one of which was "extended family relationships" which would clearly fall under the rubric of "other factors relevant to the parent-child relationship." What the chancellor may have labeled the Albright factors is irrelevant. Unlike Powell, we do not have to search the record for evidence corresponding to each factor. The written findings of the chancellor are there for us to examine.
¶ 10. What is evident, not just mere speculation as alleged by Mrs. Turner, is that the chancellor considered the parenting skills factor when formulating his custody decision. Mrs. Turner argues that the chancellor erred in finding this combined factor favored her former husband for three reasons. First, she finds that the chancellor placed undue emphasis on religion. In his discussion of this factor, the chancellor mentioned religion on two occasions. The first reference was to Mr. Turner's claim that if he was granted custody, he would be able to take Alex to the same church that the family was then attending. The record also reveals that Mr. Turner's parents attended mass at this same church. Included in Mr. Turner's claim was that he would also be able to keep the same job and would be able to keep Alex in the same school.
¶ 11. The second reference to religion was this statement by the chancellor:
The proof has shown that Mr. Turner has consistently taken the child to church. There has been little religious training shown by the mother.
Mrs. Turner has cited some authority concerning undue emphasis on religion. Mrs. Turner notes that the Supreme Court has stated that parental religious differences cannot "be the sole basis for custody decisions." Hollon v. Hollon, 784 So.2d 943, 947 (Miss.2001). The key phrase here is "sole basis." Moreover, we do not find religion to have been especially significant in the discussions we have just quoted. These two references to religion are found in the midst of almost four full pages of discussion concerning this combined factor. During the hearing, the chancellor commented that he had "allowed a good bit of testimony on this religious issue" and that *656 he could not order either party to take the child to church. Religion was not unduly emphasized.
¶ 12. Second, Mrs. Turner alleges that the chancellor failed to address the continuity of care since the date of separation. Seventeen months passed between the date of separation and the divorce. Mrs. Turner alleges that she was the primary caregiver during that period. A chancellor is to consider the period of time prior to separation and also the period of time from separation until the judgment of divorce. Jerome v. Stroud, 689 So.2d 755, 757 (Miss.1997). During any given two week period, Mrs. Turner had Alex for eight days and Mr. Turner had Alex for six. Mrs. Turner stated at the hearing that during the separation the time that Alex spent with either her or Mr. Turner was almost evenly divided. Neither parent could be designated the primary caregiver during the period of separation.
¶ 13. Third, Mrs. Turner alleges that the chancellor did not properly consider negative aspects of Mr. Turner's behavior. The chancellor made several findings adverse to Mr. Turner which included his drinking habits and social activities taking time away from Alex. However, the chancellor also noted that Mrs. Turner drank alcohol. The chancellor noted that the testimony revealed Mrs. Turner has some difficulty "being able to handle a crisis when the child is involved." The chancellor also noted that Mr. Turner was the one who took the child to the dentist, doctor, and church. The chancellor noted that Mr. Turner potty-trained the child, that the child wanted Mr. Turner when the child was sick, and that the child and Mr. Turner had "a bedtime ritual in which they spend time together with the father putting the child to bed." The problems that Mr. Turner had were noted, not overlooked, but also were not controlling.
¶ 14. The chancellor stated that Mr. and Mrs. Turner "acknowledge that both parents are good and loving parents to the child and that the child loves both of them." The chancellor noted that the "difficultly comes in deciding which parent can serve the best interest of the child in this awesome factual setting." It is clear that the chancellor considered the question of custody to be a close one. This factor was one of them, and was especially thoroughly explained on the record. We find that the chancellor reached an acceptable conclusion under this combined factor.

2. Employment of the Parent and Responsibilities of that Employment
¶ 15. The chancellor found this factor to weigh in favor of Mr. Turner despite the fact that Mrs. Turner was unemployed. The chancellor noted that "Mrs. Turner indicates she will find a nursery or daycare or her parents could help her with the child when she moves to Hattiesburg to begin her studies." Mr. Turner, a physical therapist, contended that his work schedule was flexible and allowed him to take whatever time was necessary for Alex.
¶ 16. Mrs. Turner asserts that the chancellor only found in favor of the father on this factor because Mr. Turner "provided the predominant spiritual training for Alex, emphasizing that factor above all others." We have previously dealt with this assertion and find it to be meritless.

3. Physical and Mental Health of Parents and Child
¶ 17. The chancellor found this factor to be neutral. Mrs. Turner alleges that this factor should have weighed in her favor due to Mr. Turner's recent hip surgery and frequent drinking to ease his hip pain prior to the surgery. Mr. Turner also has only one kidney. Mrs. Turner asserts *657 that she "has no such medical history, excepting only unsubstantiated depression." That Mrs. Turner's depression was "unsubstantiated" is a troubling claim when the record reveals that Mrs. Turner admitted to suffering periods of depression and having been prescribed Zoloft as needed. Mrs. Turner's father also confirmed that his daughter has occasionally suffered from depression. The chancellor found these episodes to be "remote" in time and also found that Mrs. Turner was doing well.
¶ 18. Mr. Turner did admit to consuming alcohol during the evening instead of taking pain medication prior to his hip replacement. Mr. Turner was afraid of becoming addicted to the pain medication. Mr. Turner claimed to have discussed the possibility of addiction with his doctor. Mr. Turner denied he was an alcoholic and also maintains that now he does not suffer pain since his hip replacement. Mrs. Turner confirmed that Mr. Turner has never missed work due to his alcohol consumption but was surprised that he never suffered hangovers.
¶ 19. At the hearing, both parties emphasized the other's drinking. The evidence indicates that both parents consumed either liquor, beer, or both on an almost daily basis. Both parties called witnesses on their behalf to testify that the other parent was consuming alcohol at social events. The chancellor apparently considered both parties to have consumed alcohol in nearly equal quantities and ordered both not to consume alcohol in the presence of their son.
¶ 20. The chancellor found both parties to be in equally good health. We cannot say that the chancellor erred in finding this factor to be neutral.

4. Emotional Ties of Parent and Child
¶ 21. The chancellor found this factor to be more favorable to Mr. Turner. Mrs. Turner asserts that the chancellor relied too heavily upon the statement by one witness that her son was a "Daddy's Boy" and also ignored the bond between her and her son during the seventeen month period between separation and divorce.
¶ 22. The chancellor relied on one additional fact to support his conclusion that the child was more bonded to the father: the child would ask for the father when he was sick. Also discussed elsewhere in the chancellor's written findings was the bedtime ritual of Mr. Turner and Alex. The chancellor did not ignore the bond between Mrs. Turner and Alex during the seventeen month period of separation. The chancellor began his discussion of this factor stating it was favorable to both parents. However, the chancellor ultimately found this factor to be more favorable to Mr. Turner. There was evidence to support that finding.

5. Home, School, and Community Record of the Child
¶ 23. The chancellor found that due to the child's young age there was a lack of both community and school records with which to evaluate the child. The chancellor did find, however, that the child was doing well at his current school.
¶ 24. Mrs. Turner asserts that the chancellor should have given her "at least some credit for the child's school record... since Alex has been primarily in her care from the time of the separation back in August 1999." The chancellor did not explicitly give either parent credit for the child's progress in school. Mrs. Turner is again arguing that she was the primary caregiver despite the fact that the child's time was almost evenly split between both *658 parents. The chancellor did not err in his evaluation of this factor.

6. Stability of the Home Environment
¶ 25. The chancellor found this factor to weigh in favor of the father. The chancellor made this conclusion after taking into account Mr. Turner's stated intention to return to the marital home and Mrs. Turner's stated intention to move to Hattiesburg to pursue a degree at the University of Southern Mississippi. The chancellor noted that the child would be able to remain in the same home and attend the same school and church. Also noted by the chancellor was the father's extended family in the Pascagoula area and their close proximity to the marital home. The father's parents and an aunt and uncle all resided on the same block as the marital residence.
¶ 26. Mrs. Turner asserts that the chancellor erred by making "no mention of how the stability of Alex is to be maintained by taking him away from the parent with whom he has been living for the previous seventeen months." Again, time was almost equally divided between both parents.

7. Other Factors
¶ 27. Mrs. Turner asserts that the chancellor should have considered that the father was in arrears of his temporary child support obligation by $1,250. Mrs. Turner does not detail how this should have impacted the chancellor's analysis.
¶ 28. Finally, Mrs. Turner argues that the chancellor impermissibly conditioned custody of the child on the prospective residences of the parties. Mrs. Turner argues that she was unfairly penalized for moving to Hattiesburg. Mrs. Turner alleges that Mr. Turner did not think of the idea of remaining in the marital home until the middle of the trial as evidenced by his pleadings requesting partition of that home. Not mentioned by Mrs. Turner in her brief is Mr. Turner's statement that should Mrs. Turner be granted custody of Alex and move to Hattiesburg, he would do likewise.
¶ 29. Mrs. Turner cites two decisions in support of her position that a chancellor may not consider the geographic area a child may live under a parent's custody. In one case, the Supreme Court invalidated a provision in a child custody agreement "which mandates, without exception, that children be raised in a given community." Bell v. Bell, 572 So.2d 841, 846 (Miss.1990). In the present case, the chancellor did not prohibit Alex from leaving the Pascagoula area. The chancellor only took into account as one factor the intentions of the parents as to where they would reside and the effect such intentions would have on the child.
¶ 30. The other decision cited by Mrs. Turner concerns a request for modification of custody by the non-custodial parent after the custodial parent received a military assignment requiring a move to a foreign country. Spain v. Holland, 483 So.2d 318, 318-19 (Miss.1986). The Court stated there that "we recognize today that a custodial parent's taking his or her children to a foreign nation does not per se visit an adverse impact upon the children so as to require a change of custody to the parent remaining stateside." Spain, 483 So.2d at 321. That decision is factually inapplicable.
¶ 31. The chancellor stated that his decision concerning custody was based on the ten factors and the totality of the circumstances. The detailed and extensive findings of the chancellor do not lead this Court to the conclusion that the chancellor penalized Mrs. Turner for her intention of moving to Hattiesburg.
*659 ¶ 32. There was some effort by Mrs. Turner shortly after the entry of judgment to have the custody provisions modified through the filing of a rule 60(b) motion for relief from judgment. Mrs. Turner stated that she would be enrolling in the University of South Alabama and would not be moving to Hattiesburg as she had originally planned. Filed along with this motion was a copy of a letter from the University stating Mrs. Turner has been accepted for the summer 2001 term.
¶ 33. The chancellor denied Mrs. Turner's motion. The chancellor stated that "the Court has fully gone through the custody factors developed in the decision of custody at the time of the original ruling." The chancellor stated that his analysis should stand. The potential residences of the parents was one consideration in the initial custody decision, as we have already detailed. It was not a dispositive one. The chancellor, having been alerted to the change in Mrs. Turner's plans, found no reason to change his decision. We find nothing in the new assertions to undermine the custody decision that had already been reached.
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.
NOTES
[1] It should be noted that the Supreme Court recently affirmed a chancellor's custody decision in which "the chancellor did not separately discuss each Albright factor [but] gave his rationale along with his holding as to the five factors which were found to favor" the mother. Hensarling v. Hensarling, 824 So.2d 583 (¶ 9) (2002).