906 So.2d 879 (2005)
James Delbert BROCK, Appellant
v.
Robin Sue BROCK, Appellee.
No. 2003-CA-01394-COA.
Court of Appeals of Mississippi.
April 5, 2005.
Rehearing Denied June 14, 2005.
*880 Jak McGee Smith, Tupelo, attorney for appellant.
C. Michael Malski, Tupelo, attorney for appellee.
Before LEE, P.J., MYERS and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. The Itawamba County Chancery Court granted a divorce to J.D. and Robin Brock. During the marriage, J.D. moved his family seven times in the eleven years the parties lived together. J.D. is a football coach, and Robin is a teacher. During the last year the parties lived together, Robin had an affair, and when J.D. became suspicious of her affair, he kept records of the time Robin was away from home and kept records of the parental responsibilities each party shared.
¶ 2. The parties jointly owned a number of parcels of real property. In 1992, Robin's father deeded a house to Robin in her name alone, and he retained a life estate. J.D. and Robin lived in this house for a total of approximately two years during the marriage, and Robin returned to this house after the parties separated.
¶ 3. After the chancellor applied the factors identified in Albright v. Albright, she awarded custody of the children to Robin. She also determined that the home currently occupied by Robin was her separate property. J.D. appeals, raising the following issues:
I. WHETHER THE CHANCELLOR ABUSED HER DISCRETION IN AWARDING CUSTODY TO ROBIN
II. WHETHER THE CHANCELLOR ERRED IN FINDING THAT ROBIN WAS ENTITLED TO THE HOUSE
¶ 4. Finding no error, we affirm.

FACTS
¶ 5. James Delbert (J.D.) and Robin Sue Brock were married on August 26, 1989. After they were married, they both worked in the Nettleton School District. J.D. was employed as an assistant football coach, and Robin was employed as a teacher's assistant. J.D. continued to work in the Nettleton School District during the 1990-1991 school year, while Robin changed jobs and worked at Montessori School in Tupelo.
¶ 6. In 1991, J.D. and Robin moved to Montgomery County, Mississippi, where J.D. accepted a head coaching job at Kilmichael High School. They were at Kilmichael for less than a month when J.D. decided to accept a head coaching job at East Webster High School, because they wanted to return to Robin's home county of Webster. During this period, J.D. and Robin were living in a home on South Dunn Street, in a house Robin's father owned. On February 26, 1992, Robin's father deeded the property to Robin in her name alone, but he retained a life estate in the house.
¶ 7. J.D.'s and Robin's first child, Tyler, was born on October 15, 1992. J.D. resigned from his job at East Webster in November, at the end of the football season, but he finished his contract for the 1992-1993 school year. In 1993, the family moved to Batesville, where J.D. and Robin *881 were both employed with the South Panola School District. On December 6, 1993, Robin's father deeded the house and lot on South Dunn Street to both J.D. and Robin, but this deed had a limited effect because Robin's father had already conveyed the majority of his interest in the land.
¶ 8. J.D. and Robin moved from Panola County to Philadelphia, Mississippi, after the 1993-1994 school year. In August of 1994, J.D. and Robin started the first of three school years with the Neshoba County School District. Their second son, Dallas, was born on October 9, 1995.
¶ 9. In March of 1996, J.D., Robin, and their two children moved from Philadelphia to Eupora and returned to the home on South Dunn Street. Their last child, Victoria, was born on July 2, 1997. Robin did not work during the 1997-1998 school year and primarily took care of the children.
¶ 10. In August of 1999, the Brock family moved from Eupora to Itawamba County. In February, 2000, Robin started having an affair. She also started having cheerleader practice in May of 2000 which further kept her away from home during the evening hours. J.D. was suspicious of Robin's behavior and started keeping a diary of the times Robin was away from home. Beginning in February of 2000, J.D. prepared a chart to show the number of hours Robin was away from home while J.D. took care of the children.
¶ 11. J.D. filed for divorce on January 3, 2001. Robin moved her mother into the former marital home in Itawamba County. Also in this month, Robin started taking the children to Eupora on the weekends. In April, J.D. learned that Robin was moving to Eupora. The next month, Robin took the children and moved, returning to the home on South Dunn Street.
¶ 12. In September of 2001, the parties entered a temporary order allowing Robin to keep the minor children in Eupora on a temporary basis. It was agreed in the order that the temporary arrangement would not be held against J.D. when the custody matter was heard on its merits.
¶ 13. The chancellor granted custody of the parties' three minor children to Robin. The chancellor concluded that Robin was the better choice with regard to the children's continuity of care, Robin's willingness and capacity to provide primary child care, the employment and employment responsibilities of the parents, and the home, school, and community record of the children. The moral fitness of the parties favored J.D. Robin was awarded custody, and J.D. was granted generous visitation rights.
¶ 14. With regard to the property of the parties, the chancellor distributed the property based on the factors set out in Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). She allowed each party to retain the personal property in their respective names or possession and allowed each party to retain their own retirement plans. The chancellor found that the home currently occupied by Robin on South Dunn Street was her separate property, except for J.D.'s one-half interest in Robin's father's life estate. The chancellor found that Robin's father's intent to transfer the house and land to both parties was invalid. The chancellor balanced Robin's award of the house by ordering Robin to convey a three-acre parcel of land in Mathiston, which the parties jointly owned, to J.D. The chancellor further ordered the sale of the parties' thirty-three acre tract of land, with the proceeds to be divided equally between the parties.

*882 ANALYSIS

I. WHETHER THE CHANCELLOR ERRED IN GRANTING CUSTODY TO ROBIN
¶ 15. In child custody cases, the polestar consideration is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In order to arrive at a custody arrangement that is in the child's best interest, the chancellor must make specific findings on each of the factors listed in Albright: (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Id.
¶ 16. In determining whether the chancellor abused his discretion in applying the Albright factors, an appellate court must review the evidence and testimony presented at trial under each factor to insure the ruling was supported by the record. Watts v. Watts, 854 So.2d 11, 13(¶ 5) (Miss.Ct.App.2003). Our review of the chancellor's findings is limited. This Court may reverse only if the chancellor was manifestly wrong, clearly erroneous, abused his discretion, or made findings that were unsupported by the record. Hollon v. Hollon, 784 So.2d 943, 947(¶ 13) (Miss.2001).

Age, health and sex of the child
¶ 17. The chancellor found that there were three children, Tyler, a male, ten years of age at the time of trial; Dallas, a male, seven years of age; and Victoria, a female, five years of age. The chancellor found that all three children were in good health and that this factor favored neither parent. J.D. agrees that the record supports this conclusion.

Continuity of care
¶ 18. The chancellor weighed the continuity of care factor in favor of Robin. J.D. argues that this factor should have been weighed in his favor.
¶ 19. Robin moved to Eupora in May of 2001 with the children, and the chancellor noted that the children had remained with her since that time. J.D. claims error because the temporary custody order held that the agreement would not be held against J.D. when the matter was heard on its merits. J.D. argues that the chancellor should have only examined which parent had the greater continuity of care prior to the separation.
¶ 20. J.D. kept a diary of the time Robin was away from home when he suspected she was having an affair. He introduced these findings as a trial exhibit, and he further color-coded this document to show the amount of time that he spent with the minor children versus the amount of time that Robin spent with the minor children in the year prior to the separation. This exhibit showed the exact times J.D. was home, and Robin was absent, for each evening in the year 2000. At trial, Robin could not point to one incorrect fact in this exhibit. J.D. used Robin's cell phone records to prepare his exhibit. J.D. was able to be precise in determining the times that Robin was away from home because Robin had to be away from the marital home when she used her cell phone *883 because her cell phone had no reception at the marital home. By taking the cell phone records and cross-referencing the records in his notes, J.D. was able to accurately determine how many nights and for what period of time Robin was away from home. J.D.'s exhibit shows that Robin was away from home at night for 514 hours in the period from February through December of 2000, while J.D. was at home with the children.
¶ 21. J.D. argues that the chancellor was in error for totally ignoring his exhibit. The chancellor said, "[S]he (Robin) admits that during her affair, she was absent from the home, however, this was for a short period of time as compared to J.D.'s absence throughout the marriage." J.D. argues that this finding was in error. J.D. testified extensively that his coaching duties did not require him to be away from home for excessive periods of time, and that his responsibilities only required him to be away from home until 5:00 p.m. Robin admitted that both parties took care of the children. In addition, J.D. had no other responsibilities that would prevent him from coming home at 5:00. J.D. testified that the only nights that he was away from home for any length of time were the nights that he was at the football games on Friday nights of football season. Both parties admitted that on most of these nights, the children were at the games observing their father coach, or with J.D.'s sister who was taking care of them.
¶ 22. We find no abuse of discretion in the chancellor's findings regarding the evaluation of the temporary order in her decision to award custody to Robin. The chancellor mentioned that the children remained with Robin after the separation of the parties only as an introductory fact. The chancellor's opinion itself refutes J.D.'s allegations that she used the temporary custody arrangement as a reason for granting custody to Robin. The decision notes that "parenting responsibilities have been shared," thus referencing the period of time that J.D. and Robin lived together prior to their separation.
¶ 23. The evidence supports the chancellor's conclusion that Robin should be awarded the continuity of care factor. The chancellor noted that the children's living in the South Dunn Street home was an important factor in the continuity of care because it provided a sense of security to the children. In addition, Robin spent the entire 1997-1998 school year with her children.
¶ 24. The charts J.D. introduced into evidence, while relevant, are not dispositive of the issue of continuity of care. The chancellor had an obligation to consider all of the evidence, including the demeanor of the witnesses during the trial and the parental responsibilities during the entire marriage, in reaching a determination of what would be in the best interests of the children. The evidence shows that J.D.'s charts were not probative of the quality of the relationship Robin had with her children. In addition, J.D.'s chart did not show the times that J.D. was away from home and Robin was taking care of the children. The evidence showed that J.D. was away from home for about the same amount of time as Robin during the year 2000. In fact, J.D.'s exhibit 9, which lists the parental duties performed by each parent, shows that J.D. performed only slightly more parental duties than Robin in the year she was having her affair.

Best parenting skills and capacity to provide primary care
¶ 25. The chancellor concluded that this factor favored Robin, although she did find that both parents loved their children, were actively involved in raising their children, and possessed good parenting skills. *884 J.D. argues that this factor should have weighed in his favor.
¶ 26. The chancellor found that the role of primary caretaker had been Robin's responsibility. The chancellor expressed concern with "J.D.'s willingness to continually move his family, the ongoing need to rely on Robin's family for financial support and his inability to control his emotions in front of the children." J.D. argues that the chancellor erred in singling out J.D. in his failure to control his emotions in front of the children, and totally neglected the admission by Robin that she had slapped J.D. in front of the children and cursed at him in front of the children. However, the evidence from trial shows that J.D. repeatedly cursed in front of the children, called Robin a whore and a slut in front of them, and physically abused her in the children's presence. Robin accused J.D. of pushing her to the ground when she leaned over to kiss their daughter.
¶ 27. J.D. further alleges that the court erred when it stated, "The fact that Robin has a family support system that has provided assistance in the past is encouraging." J.D. claims this statement is error because J.D.'s family provided an excellent support system when the children lived in Itawamba County. J.D.'s sister testified and expressed willingness to care for the children whenever J.D. needed a babysitter, as she had done in the past. The purpose of the chancellor's statement, however, was not to disparage J.D.'s family support system but to demonstrate that the children would receive good care in Eupora. In addition, the evidence shows that Robin's family has provided and continue to provide support in the form of financial assistance. The parties often encountered financial difficulties during the marriage, and Robin's father helped pay the family's bills. The chancellor's findings were supported by the evidence.

Employment of the parents
¶ 28. The chancellor found that this factor slightly favored Robin. J.D. alleges error in the chancellor's findings that J.D.'s responsibilities as a coach require him to work in an unpredictable schedule in a stressful environment. J.D. alleges error because there was no proof that J.D. suffered any stress as an assistant football coach. He was not the head coach, but merely an assistant coach of a high school football team and had not coached a spring sport since 1991. He also argues that the proof was to the contrary that his schedule was unpredictable, as J.D. testified that he was home almost every day before 5:00, even during football season. The chancellor also held that Robin's schedule as a teacher, in which she could come home every day at 3:00 p.m., was better fitted to the schedule of the parties' school-aged children. J.D. claims error because the facts show that during the marriage, J.D. came home before Robin came home.
¶ 29. Robin testified that there were several occasions during the marriage that J.D. would be gone until 3:00 or 4:00 in the morning. Moreover, the evidence did show that J.D.'s schedule varied depending on the time of year and the demands of the football team he coached. Some of the coaches under which J.D. worked required that J.D. come to school on Saturdays. J.D. testified that he went to his school on Sunday nights to wash or dry the football team's uniforms. Also on Sundays during football season, J.D. went back to school to review the videotapes of the prior football games. During April and May, J.D. was required to be away from home for spring football practice, and he would be away from home until 5:30 p.m. or 6:00 p.m. He was also required to coach one spring football game. Robin testified that J.D. was never satisfied with any of the coaching jobs that he held, and that he resigned *885 from some of his jobs because he did not cooperate with the head coach. During the 1998-1999 school year, J.D. was apparently tired of the stress involved with being a coach and decided to drive a school bus. In addition to his responsibilities as coach, in the year 2000 J.D. took a part-time trucking job for which he took six long road trips, some of which required overnight stays. On one trip J.D. was away from home for three days and two nights. We find no abuse of discretion in the chancellor's finding that J.D.'s schedule was unpredictable and stressful.

Physical and mental health of the parents
¶ 30. The chancellor stated, "Robin is 34 years of age and J.D. is 39. Both parents are in good physical condition. Based on testimony and behavior patterns, the Court has concerns about the emotional maturity of both. This factor favors neither parent." J.D. argues that this statement was in error and this factor should have favored J.D. to the point of being overwhelming.
¶ 31. J.D. believes the chancellor was in error because she failed to mention Robin's lapses in mental health when she conspired with her mother to blow up J.D.'s car by putting Drano in his gas tank. J.D. also recalls an incident in which Robin put a Xanax pill in his milk, describing it as a conspiracy to poison him. He also claims error for the court's failure to mention that Robin was taking medication for anxiety and stress.
¶ 32. After J.D. found out about the affair, Robin moved her mother into the home with the parties. J.D. alleges this move was done simply to harass him and to provide Robin with a basis for claiming that she was taking care of the children while she was having her affair.
¶ 33. Although it is true that Robin is taking medication for stress, the evidence also shows that J.D. has a prescription for Prozac which he refuses to fill. Robin testified that the conversation with her mother regarding their conspiracy to put Drano in J.D.'s gas tank was a joke that was never seriously considered. The chancellor was free to discount the seriousness of this testimony. Robin also testified that the purpose of putting a Xanax tablet in his milk was not to poison him but to calm him down after J.D. screamed at her for the entire night.
¶ 34. The evidence refutes J.D.'s assertion that he never showed signs of instability. The evidence, much of which J.D. denies, shows that J.D. pushed Robin around while the children were present, called Robin a whore and a slut in front of the children, and threatened to kill Robin's lover while he and Robin's lover were in a public place. Robin testified that J.D. was a violent person and verbally and physically abused her on many occasions. Robin recalled several specific instances of physical and verbal abuse. J.D. describes the moving of Robin's mother into the house as an effort to harass him, but Robin testified that her mother had volunteered to move in because the family was in an uproar, and Robin's mother believed the family needed her help. The chancellor was within her discretion in having concerns about the emotional stability of both parents.

Emotional ties of the parent and child
¶ 35. The chancellor found that both parents love their children, and the children undoubtedly love both their parents. The court found that this factor favors neither parent. Both parties agree with this finding.

Moral fitness of the parents
¶ 36. Although the court found that this factor favors J.D., the court also stated that Robin's adulterous relationship did not seem to have intruded on Robin's role *886 as a mother. Both parents testified as to having taken the children to church and to having taught them basic moral values, and the chancellor found that both parents are living productive, responsible lives. J.D. claims that the chancellor's findings are in error because he claims that the chancellor, in effect, condoned Robin's affair.
¶ 37. J.D. once again argues that the chancellor erred in discounting his extensive notes of Robin's absences from home. He argues that the chancellor's finding was not supported by the evidence because Robin's relationship involved more than 514 hours in the year 2000 alone of Robin being away from the children at night while J.D. stayed at home with the children. We disagree. In reality, the chancellor simply believed that J.D.'s evidence was not probative of what he claimed. In essence, J.D. is requesting that this Court re-weigh the evidence, an evaluation this Court is unable to make. Powell v. Ayars, 792 So.2d 240, 243(¶ 6) (Miss.2001). "As we have already observed, we are not charged to independently re-weigh the evidence and reach our own independent conclusion as to which parent we think would be the better custodial parent." Ivy v. Ivy, 863 So.2d 1010, 1015(¶ 12) (Miss.Ct.App.2004).
¶ 38. Throughout his brief, J.D. insists that the chancellor erred in awarding custody to a woman who engaged in an affair. However, our courts have established that marital fault cannot be used as a sanction in a custody determination. Albright, 437 So.2d at 1005. "Adultery of a parent may be an unwholesome influence and an impairment to the child's best interest, but on the other hand, may have no effect. The trial court should consider this factor along with all others when making original custody determinations." Brekeen v. Brekeen, 880 So.2d 280, 284(¶ 6) (Miss. 2004). In the present case, the evidence showed that Robin never talked about her affair in front of the children, never engaged in adulterous activity when her children were present, and never allowed the children to meet her lover. The evidence also shows that she was away from home for approximately the same amount of time that J.D. was away from home. The chancellor's finding that Robin's adultery did not affect her parental responsibilities was supported by the evidence.

Home, school, and community record of the child
¶ 39. The chancellor awarded this factor to Robin. J.D. claims error because the court relied on the fact that the children have lived in Eupora continually since May of 2001. J.D. argues that the children's living in Eupora was the only factor that the chancellor could have possibly used. The court found no distinction regarding the environment that the two communities might provide for the children, and the court further found that the school records of the children were the same in Itawamba County as they were in Eupora. J.D. asserts that the only way the chancellor could have found this factor to have favored Robin would be to impermissibly rely on the fact that the children had been with Robin since May of 2001.
¶ 40. J.D. misinterprets the chancellor's point when she discusses the children's school records in Eupora. The chancellor merely noted the fact that the children were successful and happy in Eupora. This statement does not indicate that the temporary order has been held against J.D. The chancellor awarded this factor to Robin because the chancellor found that Eupora was the community to which the Brock family returned during their periods of transition. We decline to overrule the chancellor's findings.

*887 Preference of the child

¶ 41. The court did not make a finding on this factor because the children were not of a sufficient age to state a preference.

Stability of the home environment
¶ 42. The court found that this factor favored neither parent. The court stated, "J.D.'s employment record raises concerns regarding the stability of the home he might provide for the children. Robin is currently living with the children in a home in which they have lived in the past." J.D. claims error in holding that J.D.'s frequent moves has somehow affected the stability of the home.
¶ 43. J.D. argues that the chancellor erred in considering J.D.'s frequent moves in deciding to award custody to Robin. He cites Bell v. Bell, 572 So.2d 841, 845 (Miss.1990), which held, "[O]ur courts may not require that children must be reared in a single community come what may." The Bell court invalidated a provision in the parties' divorce decree which mandated that the children be raised in Tupelo. Such a holding does not imply that a chancellor is not allowed to consider a parent's moves in evaluating the award of custody. Turner v. Turner, 824 So.2d 652, 658(¶ 29) (Miss.Ct.App.2002).
¶ 44. J.D. also cites S.B. v. L.W., 793 So.2d 656, 667(¶ 45) (Miss.Ct.App.2001) (Thomas, J. dissenting), where this Court stated: "The fact that a parent will or may relocate to another community should not be considered in a custody dispute absent a finding of adverse impact on the child." This statement was cited in the dissenting opinion and is therefore not binding precedent. While J.D. is correct that the family's moves had no adverse impact on the children, we hold that a chancellor is allowed to consider a parent's propensity to move when making an initial custody determination.

Other factors relevant to the parent/child relationship
¶ 45. The court did not give an opinion on this factor but was concerned that the two older children, both males, wanted to live with J.D., while the youngest child, a female, argued for Robin. Neither party claims error.
¶ 46. This Court finds no error in any of the chancellor's findings under Albright. Therefore, we affirm the chancellor's custody award.

II. WHETHER THE CHANCELLOR EQUITABLY DISTRIBUTED THE PARTIES' PROPERTY
¶ 47. The equitable distribution of marital assets is subject to the discretion of the chancellor, and the chancellor's findings will not be disturbed unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Arthur v. Arthur, 691 So.2d 997, 1003 (Miss.1997).
¶ 48. J.D. argues that the chancellor erred in awarding J.D. no interest in the house on South Dunn Street, except for a one-half interest in Robin's father's life estate. However, the evidence at trial shows that the house was deeded to Robin by Robin's father and was placed in Robin's name alone at a time when J.D. and Robin were married. The house was intended to be a gift to Robin alone. Property obtained by inheritance or by gift is nonmarital property and not subject to equitable distribution. Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994).
¶ 49. J.D. claims that he is entitled to an interest in the South Dunn Street home because it was the marital home of the parties for a period of time. However, this Court has recognized that a marital home is not necessarily marital property. In *888 Wilson v. Wilson, 820 So.2d 761, 762(¶ 1) (Miss.Ct.App.2002) the chancery court granted the ex-wife a one-half interest in the former marital home, which the ex-husband paid for through funds with origins in separate property. This Court reversed, because there was no evidence that the ex-wife made any meaningful contributions to the former marital home. Id. at 762(¶ 5).
¶ 50. J.D. also argues that he had an equitable interest in the property because he paid taxes and made repairs to the home. He argues that, in doing so, Robin's gift, intended as separate property, transmuted into martial property, subject to equitable distribution. Henderson v. Henderson, 703 So.2d 262, 264(¶ 16) (Miss.1997). We disagree. "When separate property and marital property are mixed to such a degree that the elements cannot be distinguished, i.e., that the separate element cannot be traced, then the entire property is considered marital property: the separate property has transmuted by commingling into marital property. Consequently, the key to determining when there has been transmutation by commingling is whether the marital interests can be identified, i.e., can be traced." Laura W. Morgan & Edward S. Snyder, 18 J. Am. Acad. Matrim. Law 335, 341 (2003). In the present case, J.D. made a minimal number of repairs to the house, and his contributions to the home by paying property taxes are readily traceable.
¶ 51. The chancellor was within her discretion in holding that the award of the South Dunn Street house was separate property. In addition, the chancellor specifically offset the award of the South Dunn Street house by awarding J.D. a three-acre parcel of land that the parties owned together. Thus, even assuming that the chancellor erred in finding that the house was separate property, the chancellor was within her discretion to allow Robin to take the house by balancing this award when she ordered Robin to give the three-acre parcel to J.D.
¶ 52. THE JUDGMENT OF THE CHANCERY COURT OF ITAWAMBA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.