CARLTON, J.,
for the Court.
¶ 1. Steven Jones appeals the judgment granting Rachel Jones a divorce based on the ground of habitual cruel and inhuman treatment.[1] Steven argues that the chancellor erred by (1) granting the fault-based divorce without substantial evidence, (2) not awarding joint custody of the children and allowing Steven to have mid-week visitation, (3) failing to make a formal ruling that the children were not abused by Steven, (4) awarding attorney’s fees to Rachel, (5) admitting Steven’s CO-PAC records into evidence, and (6) allowing Rachel’s therapist to testify as an expert witness. We find that the evidence supports a divorce based on the ground of habitual cruel and inhuman treatment; thus, we affirm the judgment of the chancery court as to the grant of the divorce. However, we reverse the chancellor’s deci *468 sion as to child custody and visitation, and remand the case for further proceedings consistent with this opinion.
FACTS
¶ 2. Steven and Rachel were first married in 1993. They divorced eight months later. They remarried on December 18, 1995. The couple had three children during their second marriage: Michael, Robert, and Sarah — ages ten, seven, and five, respectfully, at the time of trial.[2] Steven and Rachel separated during 2004 due to Steven’s gambling addiction. Upon Steven’s promises to change his gambling behavior, the two reunited and lived together until their final separation on November 27, 2006.[3]
¶ 3. On January 11, 2007, Rachel filed a complaint for divorce. As ground for divorce, Rachel alleged habitual cruel and inhuman treatment and, alternatively, irreconcilable differences. Steven answered the complaint and included a motion to dismiss the complaint because Rachel was not entitled to the relief requested.
¶ 4. During a pretrial conference with the chancellor, counsel for Rachel informed the chancellor that there was evidence of possible inappropriate sexual contact between Steven and the three children; namely, inappropriate bathing rituals. The children also received injuries while under Steven’s supervision: Robert suffered cuts on his lip as a result of a .six-wheeler accident, and also burned his hand in a campfire. Sarah suffered from a rash on her thighs and genitals, for which Steven did not seek medical treatment. The chancellor appointed a guardian ad litem to represent the children in this case.
¶ 5. After a three-day trial, the chancellor found that Rachel had proven habitual cruel and inhuman treatment by providing evidence of Steven’s controlling behavior, his gambling addiction, his possible pornography and sexual addictions, and the effect that such actions had on Rachel’s health. The chancellor granted the divorce, gave Rachel full physical and legal custody of the three children with visitation awarded to Steven, and awarded child support to Rachel in the amount of $1,100 per month. Rachel was awarded attorney’s fees, and both parties were awarded certain fees for various discovery violations. The chancellor denied Steven’s request for attorney’s fees that he had incurred in defending the allegations of sexual abuse.
¶ 6. Additional facts, as necessary, will be relayed during our analysis and discussion of the issues.
STANDARD OF REVIEW
¶ 7. “In domestic relations cases, [the appellate court’s] scope of review is limited by the substantial evidence/manifest error rule.” Samples v. Davis, 904 So.2d 1061, 1063-64(¶ 9) (Miss.2004) (citing Jundoosing v. Jundoosing, 826 So.2d 85, 88(¶ 10) (Miss.2002)). “[We] will not disturb the chancellor’s opinion when [it is] supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Id. at 1064(¶ 9) (quoting Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996)). However, questions of law are reviewed de novo. *469 Amiker v. Drugs for Less, Inc., 796 So.2d 942, 945(¶ 7) (Miss.2000). “The chancellor’s determination of whether a spouse’s conduct rose to the level of cruel and [inhuman] treatment is a determination of law.” Kumar v. Kumar, 976 So.2d 957, 960(¶ 13) (Miss.Ct.App.2008) (citations omitted).
DISCUSSION
I. Habitual Cruel and Inhuman Treatment
¶ 8. Steven argues that Rachel failed to introduce sufficient evidence to prove the divorce ground of habitual cruel and inhuman treatment. Rachel responds that the chancellor correctly granted the divorce because the evidence of Steven’s habitual cruel and inhuman treatment, and its effect on Rachel, was overwhelming.
¶ 9. Mississippi Code Annotated section 93-5-1 (Rev.2004) provides that a divorce may be granted to the injured party based on habitual cruel and inhuman treatment. Such ground for divorce is established by evidence that the conduct of the spouse either:
(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.
Kumar, 976 So.2d at 961(¶ 15) (internal quotations and citations omitted). The supreme court has held that more is required “than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the ground of cruel and inhuman treatment.” Robison v. Robison, 722 So.2d 601, 603(¶5) (Miss.1998) (internal quotations omitted). “There must be corroboration of the complaining party’s testimony” for a divorce based upon habitual cruel and inhuman treatment. Chapel v. Chapel, 700 So.2d 593, 597(¶ 19) (Miss. 1997).
¶ 10. After a trial held on September 12, 13, and 17, 2007, the chancellor found:
This cause was set for a final hearing before this Court on September 12, 2007 with some time reserved on September 13 in case the parties were unable to conclude in one (1) day. The trial, however, lasted September 12, 13, and 17, 2007. Both parties were represented by counsel with Eric Malouf, Esq. representing the Plaintiff and William Bell, Esq. representing the Defendant. The Court appointed Meda Lindley, Esq. as the guardian ad litem for the three (3) minor children in this cause. Having thoroughly reviewed the testimony of the eight (8) witnesses presented at trial, the exhibits entered into evidence, the pleadings, the reports of the guardian ad litem, and the proposed findings of fact and conclusions of law submitted by both parties, this Court does hereby enter its opinion and final judgment in this cause.
I. Jurisdiction
This Court has jurisdiction over this matter as Rachel Jones[4] and Steven Jones are adult residents of Madison County. Rachel and Steven were married on December 18, 1995 and finally separated near the end of November 2006 in Madison County. Three children have been born to the parties: Michael Jones born November 14, 1996, *470 Robert Jones born August 31, 2000, and Sarah Jones born July 17, 2002.
II. Background History
Through the final separation occurred in November 2006, it was not the first separation of the parties. The parties, in fact, first married each other on June 5, 1993 then divorced after eight (8) months and remarried on December 18, 1995. Rachel and Steven also separated briefly in 2004. Rachel testified that Steven’s behavior caused each separation and that she only returned to the relationship after his assurances of change.
Rachel filed her Complaint for Divorce initiating this cause of action on January 11, 2007 requesting that this Court grant a divorce to her on the ground of habitual cruel and inhuman treatment or irreconcilable differences. Steven answered her complaint on March 7, 2007 requesting her complaint be dismissed. Notably, Steven did not counter-sue Rachel for a divorce. Therefore, the burden lay solely upon Rachel to establish grounds for a divorce if Steven would not agree to an irreconcilable differences divorce.
III. Grounds for Divorce
While a plethora of appellate decisions exist providing chancellors guidance on when a divorce should be appropriately granted or denied on the ground of habitual cruel and inhuman treatment, several consistent themes run through the case law. In order for this Court to grant a divorce to Rachel on the ground of habitual cruel and inhuman treatment, she must prove by a preponderance of the evidence that Steven’s conduct either 1) endangers life, limb or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or 2) in the alternative, be so unnatural and and infamous as to make the marriage revolting to the [offended] spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. Mitchell v. Mitchell, 823 So.2d 568, 570-71 (Miss.Ct.App.2002). Habitual cruel and inhuman treatment does not require physical violence as the negative impact upon the plaintiff can be to her mental health, but it does require something more than “mere unkindness, rudeness, petty indignities, frivolous quarrels, incompatibility or lack of affection.” Bodne v. King, 835 So.2d 52, 58-59 (Miss.2003); Reed v. Reed, 839 So.2d 565, 571 (Miss.Ct.App.2003). Cruelty may be found from a series of separate events or acts “such as willful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.” Jackson v. Jackson, 922 So.2d 53 (Miss.Ct.App.2006). The chancellor may consider conduct before and after the separation, but the conduct must be “routine and continuous.” Morris v. Morris, 783 So.2d 681, 688 (Miss.2001); Jackson v. Jackson, 922 So.2d 53, 56 (Miss.Ct.App.2006). Since the conduct’s effect on the suffering spouse determines whether a divorce on the ground of habitual cruel and inhuman treatment is warranted, the chancellor has a dual focus: the conduct of the offending spouse and the impact of that conduct on the offended spouse. Bodne, 835 So.2d at 59; Reed, 839 So.2d at 571. “The effect of the conduct on the offended spouse is determined by a subjective standard, which is to say that an attempt is made to weigh the likely effects of the conduct on the offended spouse, as opposed to a normative standard.” Bodne, 835 So.2d at 59. Finally, *471 the chancellor is vested with the sole authority and responsibility to assess witness credibility as no jury is present. See Bodne, 835 So.2d at 58; Morris, 783 So.2d at 687.
In light of the foregoing precedent, this Court reviewed the testimony and other evidence and finds that Rachel proved habitual cruel and inhuman treatment by a preponderance of the evidence. A total of four (4) witnesses were introduced in Rachel’s case in chief. One witness was a representative of COPAC who testified solely regarding the authenticity of Steven’s COPAC records which this Court allowed into evidence. She did not collect the information contained within the records and therefore did not testify to interpret or explain anything in the records. The other three witnesses were Rachel, her treating therapist Dr. Ruth Glaze, and her sister Brooke Daniel. The therapist was accepted by the Court as an expert in counseling and therapy. In his case in chief, Steven, his sister Cynthia Jones, and Rachel testified.
Rachel testified as to Steven’s behavior throughout their relationship. During the first marriage, Rachel testified that Steven was mentally abusive, very controlling and forced her to engage in degrading sexual behavior. They divorced after about eight months, but Rachel remarried Steven in December 1995 thinking he had changed. However, Rachel testified that Steven had not changed his ways as the same behaviors arose and grew worse until May 2004 when she separated from him for about three months. During the separation, Steven again indicated a willingness to change to keep the family together so Rachel and the children returned. Finally, Steven’s criticisms, yelling, putdowns, gambling, lies, controlling behavior and degrading sexual behavior reached a critical mass of affecting Rachel in October 2006 that she sought psychological counseling with Dr. Ruth Glaze.
Rachel claims that Steven’s controlling nature, sexual behaviors, and addictions to gambling, pornography, and sex throughout marriage constitutes habitual cruel and inhuman treatment. While Steven was gambling, he also constantly blamed Rachel for their financial problems. She would purchase some of the kids’ clothing, bras for herself, and furniture at garage sales to save money for the family. Neither party provided a figure as to Steven’s gambling losses during the marriage. Rachel believes Steven has lost $100,000 gambling. She testified that she estimated this figure from bank statements, refinancing of the house which paid off credit card debt largely attributable to the gambling losses, and their joint tax returns in the past which have also been used to pay gambling debts. Steven admitted in his CO-PAC records to losing between $70,000 and $80,000 and in another place approximately $2000 per month. Steven backed away from these admissions on the witness stand and was quick to point out that although he does have an addiction to gambling the family bills were always paid. However, just because Steven is a functioning gambler does not mean there has been no negative impact on the family. This Court cannot set an exact amount of gambling losses but believes the true amount could be quite substantial. Every dollar lost in gambling was less to put down on the house or into retirement funds or other savings. Also, Rachel’s mother loaned them $10,000 and paid for some family vacations.
This Court agrees that the cumulative effect of these behaviors and the corre *472 sponding effect to Rachel’s health meet the burden required to prove habitual cruel and inhuman treatment. Rachel, Dr. Glaze, and Ms. Daniel testified to Rachel’s weight loss this past year. Rachel testified that her stomach problems have been increased by Steven’s behaviors. Steven testified that Rachel did take over-the-counter medications for a stomach condition but that she had taken these medications since he has known her and others in her family have this condition as well. Dr. Glaze counseled Rachel approximately twenty-five times from October 2006 through the day of the trial, testified that Rachel showed improvement after Steven moved out and that a separate living arrangement is necessary for her to fully recover. Dr. Glaze testified that based on her numerous sessions with Rachel, the Joneses marriage is unhealthy for Rachel and that time apart from Steven will allow Rachel to develop a sense of self and hopefully rely more upon herself and not seek the approval of others. Steven admitted in Court to stealing Rachel’s diary and discussing its contents with his family members after having had previously and repeatedly told Rachel he had not taken it. Steven made other admissions during his CO-PAC treatment but was quick to deny or qualify those admissions while on the stand.
Based upon the credible testimony of Rachel, Dr. Ruth Glaze, and Brooke Daniel, this Court is of the opinion that Steven has inflicted habitual cruel and inhuman treatment throughout the marriage. Therefore, Rachel should be granted a divorce from Steven on the ground[s] of habitual cruel and inhuman treatment.
¶ 11. Steven argues that Rachel failed to introduce sufficient evidence to prove the divorce ground of habitual cruel and inhuman treatment. He further asserts that the evidence in this case is more suited for an irreconcilable differences divorce, arguing that this case presents only marital unhappiness, likely to change as often as the seasons.[5] See Wilson v. Wilson, 547 So.2d 803, 805 (Miss.1989). However, we disagree with Steven’s assertion that the chancellor erred in granting this divorce based upon the ground of habitual cruel and inhuman treatment. In Wilson, the esteemed jurist Justice Robertson noted that “[i]t is the law in this state that the [Ljegislature has exclusive authority to provide the grounds for divorce,” and that as judges, our oaths require us to take those grounds seriously. Id. Justice Robertson also explained that the statute setting forth the grounds for divorce was to be taken in its “common and ordinary meaning,” thus requiring parties seeking a divorce on the ground of habitual cruel and inhuman treatment to “prove that the conduct of the offending spouse really was cruel and inhuman, and habitually so.... ” Id.
¶ 12. The record reflects that the chancellor followed the law in granting this ground for divorce, as defined by the Leg *473 islature, where Rachel established by a preponderance of the evidence the ground for a divorce based on habitual cruel and inhuman treatment. Rawson v. Buta, 609 So.2d 426, 431 (Miss.1992). We must now turn to the actual language of the controlling statute to study what constitutes this ground for divorce under Mississippi Code Annotated section 93-5-1 (Rev.2004).
¶ 13. The plain and ordinary language of section 93-5-1 contains two prongs, setting forth two types of conduct sufficient to establish this ground for divorce. The first prong addresses conduct that creates danger to “life, limb, or health,” or “reasonable apprehension of such danger, [that renders] the relationship unsafe” to the non-offending spouse. The second prong addresses conduct of the offending spouse that is “so unnatural and infamous as to make the marriage revolting to the non-offending spouse,” thereby rendering impossible the discharge of marital duties by the non-offending spouse.
¶ 14. In support of her request for a divorce on the stated ground, Rachel presented an array of supporting evidence and abuses. More specifically, Rachel points to a diverse combination of Steven’s behaviors that she found so repugnant to warrant this ground for divorce, including humiliating sexual behavior, gambling addiction, degrading verbal putdowns, bullying, and yelling. We note that while separately offensive to Rachel, the record reflects that the conduct herein combines to create continuing repugnant and emotionally abusive conduct toward Rachel.
¶ 15. As to the sufficiency of evidence supporting the chancellor’s decision to grant the divorce, the record reflects substantial and strong testimony regarding Steven’s behavior. When Rachel was asked what was her understanding of her husband’s sexual addiction, the following exchanged occurred:
A. My understanding of sexual addiction, it was never enough. No sexual — no sex was ever enough for [Steven], And whenever he decided that we were going to have sex, then that’s what we’re going to do, and if I did not, whether I had a stomachache or was tired or if I just didn’t want to, that choice is not mine. I am punished by not being able to sleep.
Q. How do you not sleep?
A. Because he turns the light on. He would turn the TV on up loud, make snide comments, if I was asleep — if I did happen to fall asleep and then have to go to the restroom, he would make, you know, “it must be nice to be able to be sleeping.”
Q. How else would he punish you for not participating in sex when he desired?
MR. BELL: Objection. That’s leading.
THE COURT: No, that’s not, Counsel. Overruled. You can answer.
A. The other ways that [Steven] would punish me for not having sex when he wanted to have sex is just, you know, withholding money, ignoring and yelling, and the home environment would just be very tense to where it was just unbearable. And I would just finally give in. And he knew that I would finally give in. And at times after I would give in, he would just say, “You should have done this a long time ago. You should taken care of this a long time ago.” And then after I would, there have been many nights that I would go to the bathroom after I would do something I didn’t want to do and just cry. And that was something that has never changed in our rela *474 tionship. And I can no longer be subjected to that — no longer, because it has robbed me of my dignity-
And then he’s saying he’s so stressed because of what’s going on with his work. And all in all, I mean, maybe he’s stressed because of our financial situation, and now I find out the financial situation is because he’s gambling. And I’m doing my best to save money. I’m shopping at garage sales. I’m doing whatever it is that I can to make this home a healthy home for our children, and it’s never enough. And it’s all my fault. And whatever I do, I think that what I’m doing is going to help and save the situation, and all the while he is over on the side lying and deceiving me and then blaming all of our problems on me. If I would only have had sex with him more. He needs that sexual release. He needs it. And it’s never enough.
Q. I don’t want to ask this question, Ms. [Jones], but what sexual activities would he make you do that you didn’t want to do?
A. Every time before we have sex, before we get started, he pushes my head down on his penis to get started. And I’ve told him year after year I do not like that. It’s very degrading. And he said, “You’ve got to get it ready. You’ve got to get it ready.” And it is very degrading.
Q. Were there any other sex acts that were degrading?
A. He did want to do anal sex, and I refused, and he would just keep asking. And that’s just not something that I want to do. And I never feel as though I’m pleasing [Steven] sexually. It’s never enough.
Q. Did he keep his promises to change when you took him back in 2004?
A. No. And I told him I could not physically take it if he did not stop his mistreatment of me and his lies and his gambling. I said, “cannot take it.” And he said, “No more.” And then here we are. And nothing ever gets — it’s always worse. Each time I go and give another try, each time it’s worse. It gets worse and worse and worse. It does not improve. It’s a continuum, and it’s worse.
Q. What physical health problems were you suffering from at the time you decided that you would again seek to divorce [Steven]?
A. Well, because it’s so much stress, and when I’m stressed I can’t eat. I get nauseous and I have diarrhea, and it’s just physical stress. It’s just overwhelming.
Q. Did you lose weight?
A. Yes, I have.
Q. When did you lose weight? How much weight did you lose?
A. Since this — since, I guess, September or October I’ve lost about twenty pounds — fifteen to twenty pounds.
THE COURT: I’m sorry. Of what year?
THE WITNESS: Of '06 and '07?
BY MR. MALOUF:
Q. What other physical effects did this — what you’ve described — what other physical effects did it have on you?
A. My hair is falling out, the stress, I asked the girl that eut[s] my hair the last time I went, “I think my hair’s getting curly now.” And she said, “No”
*475 MR. BELL: Your Honor, I’m going to—
THE COURT: Sustained as to the hearsay.
A. I’ve lost hair and I have new growth coming in.
Q. Any other ways that it affected you — your sleep, your ability to work, your ability to take care of the kids?
THE COURT: Don’t lead the witness, Counsel.
MR. BELL: Your Honor, again, he’s feeding her the answers, and that’s leading.
THE COURT: Counsel, I noted that. Thank you. Sustained. Rephrase your question, Counsel.
BY MR. MALOUF:
Q. Ms. Jones, what other impacts? You mentioned the stomach and loss of weight. What other problems, were you having?
A. Unless you’ve been in a relationship or marriage or home, lived with an addict, you cannot understand the toll it takes. You’re thrown off balance because you’re being told this is what’s happening over here, but in fact that’s not what’s happening over here. And, you know, the lies and the deception and the blame and then the anger and the irritability. It’s an unbearable environment. It’s very stressful.
¶ 16. Based on this testimony, we find the evidence more than sufficient to grant a divorce on the ground of habitual cruel and inhuman treatment, as we find that there also was sufficient corroboration of Rachel’s testimony.
¶ 17. In this opinion, we will review the evidence herein relative to the requirements of a divorce based on the ground of habitual cruel and inhuman treatment, as set forth in the two prongs of statutory language under section 93-5-1. We will then evaluate corroboration of the ground, and the applicability, or rather the inapplicability, of condonation to this case. We will then review the chancellor’s decisions as to child custody and attorney’s fees, and then we will review Steven’s remaining assignments of error regarding admission of medical records and the admission of the expert testimony of Rachel’s therapist.
A. First Prong of Section 93-5-1
¶ 18. Regarding the first prong of section 93-5-1 setting forth the first type of conduct sufficient to warrant a divorce based on habitual cruel and inhuman treatment, we find that the record contains substantial evidence of such conduct to support the chancellor’s grant of divorce.
1119. In support of her claim that Steven subjects her to degrading sexual acts, Rachel provided strong testimony as exemplified in the foregoing testimony and as corroborated by Steven’s COPAC records. Rachel’s testimony showed the impact of the offending behaviors in creating an unhealthy and emotionally unstable environment that caused her physical health to diminish and further caused the entire house to “walk on egg shells.” Regarding the degradation, Rachel testified that she lost all dignity. Rachel’s sister, Brooke, corroborated Rachel’s assertions by testifying as to Rachel’s comments about her marriage, as well as to Rachel’s emotional state during the marriage. Moreover, Rachel’s treating therapist, Dr. Ruth Glaze, testified as to the impact of Steven’s offending behaviors on Rachel’s overall health physically and emotionally. Physically, Steven’s combined offending behaviors caused Rachel to suffer hair loss, weight loss, and stomach ailments, including diarrhea.
*476 ¶ 20. With respect to Steven’s sexual behavior that Rachel found offensive, we turn to a study of our jurisprudence reflecting that a single act of sexual abuse may be sufficient to support a divorce based on the ground of habitual cruel and inhuman treatment if proven by a preponderance of the evidence. See Fulton v. Fulton, 918 So.2d 877, 880(¶7) (Miss.Ct.App.2006). We observe that domestic abuse takes on many forms, but “has one common denominator in that it generally occurs between family members or current or former intimate partners. Domestic abuse may be physical, emotional, or sexual.” Encyclopedia of Mississippi Law § 30:1 (Jeffery Jackson and Mary Miller ed.2001). In Chamblee v. Chamblee, 637 So.2d 850, 860 (Miss.1994), the chancellor denied the wife a divorce on the ground of habitual cruel and inhuman treatment where she was the only witness offering testimony supporting her claim that her husband forced her to have sex with him against her will. The Chamblee court explained that if sufficient evidence had been presented to meet the burden of proof in support of this claim of sexual abuse, then a claim of cruel and inhuman treatment would have been justified. Id. In following the analysis of the Chamblee court, Rachel presented more than ample evidence of diverse repugnant conduct, and we find that more corroborative evidence exists than just the singular testimony of a sole spouse claiming that she was subjected to degrading and offensive sexual behavior by the offending spouse.
¶ 21. We note that the COPAC records contain a discharge summary, concluding that not only was Steven unwilling to stay away from casinos, but he also lacked any insight into the impact of his impulsive behavior or cravings on his addictions. The discharge summary further reflects that Steven indicated during treatment that he possessed some problematic behaviors relating to his sexual history. However, since he only stayed in rehabilitative treatment for twenty-eight days, the summary reflected insufficient time existed for him to participate in the sexual addiction treatment. The COPAC dictations also note that Steven chose not stay for the ten additional treatments pertaining to the impact of his sexual behavior. This evidence provides more than sufficient corroboration of the degrading sexual behavior Rachel found offensive.
¶ 22. Additionally, we note that the record also reflects other inappropriate sexual behavior aside from that discussed in his sexual questionnaire and portrayed in Rachel’s testimony. Steven bathed naked with all three children for most of their lives until the children were the following ages: Michael, ten; Robert, six; and Sarah,[6] five. At that time, the guardian ad litem advised Steven to stop engaging in such behavior and apparently assumed he stopped the practice. See Crutcher v. Crutcher, 86 Miss. 231, 38 So. 337, (1905) (pederasty found as a sufficient ground for divorce based on habitual cruel and inhuman treatment); see Cherry v. Cherry, 593 So.2d 13, 17 (Miss.1991) (testimony of husband’s sexual problems including impotence and occasions on which husband dressed in women’s clothes sufficient to support granting divorce for habitual cruel and inhuman treatment). After the divorce was filed, Steven and Rachel continued to live in the same house, yet they were separated. During this time, Steven went to COPAC for thirty days. As stated, the record reflects that while at CO-PAC, Steven sought help for his gambling addiction and also admitted to unspecified *477 inappropriate sexual activities. He returned home, although his COPAC records reveal that Steven’s pending legal problems motivated him to participate in treatment, rather than his desire to seek recovery. The record also reflects that he lacked insight into his own character and seemed to blame Rachel for his problems. Steven’s prognosis for recovery was reported as very poor.
¶ 23. Then, upon his return home from COPAC on a Saturday evening, after being in treatment for his gambling addiction for a month, testimony reveals that Steven tried to force his ten-year-old son to take a bath with him, grabbing his son by the arm, even though the boy screamed in protest. Rachel stated that she intervened when she heard her son screaming. Rachel testified that the next morning, she saw Steven shave his pubic hair, and then once again tried to get the children to bathe with him. Rachel intervened again, and took the children to church to get them away from Steven. The record reflects that Rachel found this behavior offensive and alarming.
¶ 24. Subsequent to their in-home separation, Steven moved out of the family home and was granted visitation rights. During a fifteen-day visitation, Sarah developed a rash and blisters in her private area and upper thighs, which was diagnosed as impetigo. Steven asserted that Sarah told him that the rash was caused by a car seat belt. However, during his visitation period, Steven failed to seek medical treatment for Sarah, and he refused to allow Rachel to see Sarah until four days later, when his visitation period ended. Nothing in the record shows that the rash was tested to confirm its cause. The record reflects that Sarah was in so much pain from the rash that when Rachel picked her up several days later, Sarah was sitting with her legs spread apart.
B. Second Prong of Section 93-5-1
¶ 25. Next, in addressing the second prong of the statute in more detail, which sets forth the second type of conduct that may serve as the basis for this ground of divorce, we note that the impact of the conduct upon the non-offending spouse is a subjective test, thus falling within the province of the chancellor; therefore, it is beyond this Court’s scope of review. Keough v. Keough, 742 So.2d 781, 782(¶ 5) (Miss.Ct.App.1999); Deborah H. Bell, Bell on Mississippi Family Law § 4.02[8][b] at 72 (2005). Intrinsic in this analysis is whether the record supports the chancellor’s findings that the offensive conduct occurred, and if it occurred, whether it was so repugnant as to render the discharge of marital duties impossible for Rachel. Id. We find that the evidence of the combination of the offensive conduct in the record sufficiently, supports the chancellor’s findings. Again we note, Rachel submitted four witnesses[7] in her case-in-chief, the COPAC records, and evidence of Steven’s adult bookstore membership.
¶ 26. This case presents a combination of offensive behavior to Rachel, which, when taken together, meets the definition of habitual cruel and inhuman conduct, which the chancellor found sufficient to grant the divorce on that basis. Our jurisprudence recognizes that the cumulative impact of the offensive and even repugnant behaviors over a long period of time might constitute cruelty, while similar conduct for a shorter time, or with fewer factors *478 might not be cruelty. See Rakestraw v. Rakestraw, 717 So.2d 1284, 1287-88(¶ 10) (Miss.Ct.App.1998) (combined effect of husband’s neglectful and abusive practices over the twenty-five-year marriage sufficient to warrant a divorce based on the ground of habitual cruel and inhuman treatment); see also Richard v. Richard, 711 So.2d 884, 890(¶23) (Miss.1998) (addictive behavior, when combined with other conduct, sufficient to support a finding of cruelty).
¶ 27. We note that the law does not require sexual abuse to establish this ground for divorce. Jurisprudence reflects that the Mississippi Supreme Court has recognized that sexual indignity can rise to the level of being so repugnant to the non-offending spouse so as to render impossible the discharge of marital duties, thereby defeating the whole purpose of the marriage. Crutcher, 86 Miss, at 231, 38 So. at 337; Stockton v. Stockton, 203 So.2d 806, 807 (Miss.1967). Steven’s inappropriate bathing ritual with the children also provides supporting evidence of sexual indignity.
¶ 28. In seeking guidance from precedent regarding repugnance of sexual indignities, we turn to the early case of Crutcher, 86 Miss, at 231, 38 So. at 337, where the supreme court found that pederasty on the part of a spouse, like sodomy, fell within the meaning of cruel and inhuman treatment under the divorce statutes as an infamous indignity to the wife. In Crutch-er, the wife considered the indignity to be so revolting that she could not discharge her duties as a spouse, and the court recognized that such inability to discharge the marital duties would defeat the whole purpose of the relation. Id.
¶ 29. Similarly, in Cherry, 593 So.2d at 17, the supreme court found that testimony concerning the husband’s sexual problems, including impotence and dressing in women’s clothing, provided sufficient evidence to support granting a divorce on the ground of habitual and inhuman treatment. Additionally, the wife testified that her husband’s sexual problems “like to [have] drove her insane.” Id. In Stockton, 203 So.2d at 807, Mr. Stockton asked Mrs. Stockton to engage in unnatural sexual relations, and suggested that they whip each other. He also allegedly asked Mrs. Stockton to engage in similar relations with another man. Id. The supreme court affirmed the chancellor’s grant of a divorce based upon habitual cruel and inhuman treatment. Id. at 808. Therefore, we find that the combination of Steven’s behaviors, including his sexual behavior, financial conduct, and his verbal degradation, so repugnant to Rachel to render her unable to perform her marital duties and sufficiently supports the chancellor’s grant of divorce on this ground.
C. Corroboration of Evidence of Habitual Cruel and Inhuman Treatment
¶ 30. This Court requires corroboration of the offensive conduct complained of by the moving party when seeking a divorce based on the ground of habitual cruel and inhuman treatment, except in unusual cases such as isolation. Rawson, 609 So.2d at 431; Heatherly v. Heatherly, 914 So.2d 754, 757(¶ 12) (Miss.Ct.App.2005). The testimony of the defendant may also provide corroboration. Gatlin v. Gatlin, 234 So.2d 634, 635 (Miss.1970). Additionally, “the corroborating evidence need not be sufficient in itself to establish the ground,” but rather “need only provide enough supporting facts for a court to conclude that the plaintiffs testimony is true.” Bell on Mississippi Family Law § 4.02[8][d] at 74 (citing Anderson v. Anderson, 190 Miss. 508, 200 So. 726, 728 (Miss.1941)).
*479 ¶ 31. The record reflects that more than sufficient corroboration exists in this case to support the chancellor’s grant of divorce on the ground of habitual cruel and inhuman treatment based on Steven’s offending conduct writings as set forth. As previously noted, Rachel presented four witnesses in her case-in-chief and Steven’s COPAC records. The medical records from COPAC provide corroboration of Steven’s financial conduct and sexual conduct, which manifested itself in conduct so repugnant to Rachel that she could not endure the marriage any longer. Dr. Glaze provided testimony as to the effect of Steven’s abuse on Rachel’s physical and mental health. An adult bookstore membership was also provided as evidence corroborating his sexual conduct. Steven’s COPAC records reveal that during his treatment for addictive gambling, he voluntarily completed a men’s sexual addiction screening test.
¶ 32. In his sexual addiction screening test, Steven admitted that he felt that he needed to discontinue a certain form of sexual activity, and had worried about people finding out about his sexual activities. He also admitted that he had trouble stopping his sexual behavior when he knew it was inappropriate. Again, corroboration must be sufficient enough to provide some supporting facts for a court to conclude that the plaintiffs testimony is true. See Bell on Mississippi Family ' Law § 4.02[8][d] at 74 (citing Anderson, 200 So. at 728).
¶ 33. The COPAC records also reflect that Steven often relied on others to pay bills and borrows money to pay his bills due to the loss of money resulting from his gambling addiction. The records show that Steven used an assortment of credit cards to finance his gaming, and the record shows that during one night of gambling, he put $10,000 on one credit card. Steven admits to gambling with $200,000 to $300,000 in his lifetime, and he has lost $70,000 to $80,000. He stated that his gambling losses amounted to approximately $2000 a month, and his gambling grew from tens of dollars at a time in the mid-nineties to thousands of dollars at a time in 2003 and 2004. In his own writings, Steven further acknowledges that for the past several years, every time he gambled he endangered the welfare of his family. Clearly, the record contains more than sufficient evidence to corroborate Rachel’s testimony, and the record reflects substantial evidence supporting the chancellor’s grant of divorce on the stated ground.
D. Condonation of Habitual Cruel and Inhuman Treatment
¶ 34. Although Rachel and Steven continued to reside together in the family home after filing for a divorce, “[h]abitual cruel and inhuman treatment is an offense of a continuing nature and is not condoned by the mere continuance of cohabitation.” Cherry, 593 So.2d at 18 (quoting Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss.1983)). In Cherry, the supreme court found that the conduct was not condoned by the wife because of the mere fact that she knew about it, and to some degree condoned it by living with the offending spouse. Id. The Cherry court explained:
Condonation is the forgiveness of the marital wrong on the part of the wronged party. Condonation may be expressed or implied. The mere resumption of residence does not constitute condonation of past marital sins and does not act as a bar to a divorce being granted. Condonation, even if a true condonation exists, is conditioned on the offending spouse’s continued good behavior. If the offending party does not mend his ways and resumes the prior course of conduct, there is a revival of the grounds for divorce. In practical *480 effect, condonation placed the offending party on a form of temporary probation.
Id. at 17-18. In the instant case, Steven has violated his promises of recovery and rehabilitation to Rachel; therefore, no con-donation exists. She should not be found to have condoned his behaviors where he promised recovery and where she sought to preserve a family for her children based upon the hopes of his promises. Unfortunately, the record shows that he has failed to mend his ways and rehabilitate as reflected in his behavior toward Rachel, his financial conduct, as well as in his COPAC records, which predicted that Steven was not likely to mend his ways.
¶ 35. In sum, we find that no condonation exists herein where Steven has promised recovery.
II. Child Custody and Visitation Rights
¶ 36. Steven argues that the chancellor erred by not awarding joint legal custody of the children to both him and Rachel, as recommended by the guardian ad litem. Steven also submits that per the guardian ad litem’s recommendation, the chancellor should have awarded him midweek visitation.
¶ 37. After the trial, the chancellor awarded Rachel sole physical and legal custody of the three children, subject to Steven’s visitation rights. We find that the chancellor’s decision to allow Steven unsupervised visitation lacks evidentiary support, and we therefore remand for further consideration by the chancellor. We reach this determination upon discerning that the guardian ad litem’s conclusion that no child abuse occurred lacked factual basis. The record fails to reflect that the guardian ad litem was qualified to render such a conclusion. Moreover, the record reflects that her conclusion in this case lacked any factual basis since no inquiry was done to determine if the children had been sexually abused or not. See S.G. v. D.C., 13 So.3d 269, 274 n. 5 (Miss.2009) (Guardian ad litem qualifications should be based on the principles set forth in Daubert v. Merrell Dow Phamaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). As stated, the record fails to reflect that the guardian ad litem possessed qualifications in the area of child sexual abuse or investigation thereof by training, certification, or experience to investigate child sexual abuse or to render an expert opinion in such matters. See S.N.C. v. J.R.D., 755 So.2d 1077, 1082(¶ 16) (Miss.2000); Mooneyham v. State, 915 So.2d 1102, 1103-04 (¶¶ 3-6) (Miss.Ct.App.2005). Glaringly absent from the guardian ad litem’s report is any kind of qualified expert opinion, DHS investigation, law enforcement investigation, or other expert inquiry as to allegations of child sexual abuse raised by Rachel’s counsel. See M.R.E. 702; see Catherine Dixon, Best Practices in the Response to Child Abuse, 25 Miss. C.L.Rev. 73, 89-92 (2005) (Discusses experience and qualifications needed by an expert or interviewer to conduct forensic interviews with children who have been victims of sexual abuse); compare J.P. v. S.V.B., 987 So.2d 975, 979(¶8) (Miss.2008) (when presumption of violence is raised and not rebutted, custody is awarded to non-violent spouse).
¶ 38. The guardian ad litem’s report indicated that she had talked to the children about a range of things, but the record lacks any inquiry of the children into whether or not sexual abuse had occurred. The record is also silent as to whether any report of the allegation had been made to DHS, as required by the Mississippi mandatory report statute, and it also fails to reflect any involvement by a social worker, child psychologist, or other expert trained in child sexual abuse. See Miss.Code Ann. § 43-21-353 (Rev.2009) *481 (mandatory report statute for child abuse, imposing a duty to cause an oral report to DHS based on reasonable cause to suspect a child is abused or neglected).
¶ 39. We note that the facts in this record raise concern and bring to light the need for inquiry, and a need for a qualified factual basis for the guardian ad litem’s conclusion, as to whether any sexual or physical abuse occurred or not. The record contains testimony about the inappropriate bathing ritual, and Steven’s attempt to force the children to bathe with him upon arrival home from COPAC. The record reflects that Sarah’s rash developed and remained untreated while in Steven’s care, and it was allegedly eventually diagnosed as impetigo. The guardian ad litem reported that she had talked to Sarah’s regular physician, and the physician explained that impetigo was common in children, but the report did not indicate that this physician treated or personally diagnosed the rash at issue. Also, the record contained no evidence that Sarah’s rash had actually been tested to accurately determine the cause.[8] The record reflects that the boys, Michael and Robert, also exhibited conduct concerning to their school principal. The principal reported to the guardian ad litem that the older son had gender issues, and he preferred to participate female activities. The record also reflects that Rachel had previously shown concern that Michael played dress up. The principal also reported that the younger son had anger issues.
¶ 40. Due to the lack of assistance or investigation by a qualified professional in the area of child sexual abuse, we remand so that the chancellor may obtain necessary assistance in such matters to assist the court prior to making any factual determination as to whether evidence of sexual abuse exists and any related custody matters.[9] In S.G., 13 So.3d at 274(¶ 13), the court surmised that without a qualified expert assessment, the guardian ad litem’s recommendations provided only personal opinions of the guardian ad litem that she was not qualified to render. The conclusion, therefore, lacked a factual basis since there was no appropriate inquiry. Similarly, in this case, as stated, the record fails to reflect that the guardian ad litem possessed the qualifications to investigate child abuse, to determine substantiation, to interview children regarding allegations of sexual abuse, or to make any expert conclusions as to whether the allegations were substantiated or not. The determination as to whether sexual abuse occurred is a factual determination to be made by the chancellor. Here, the chancellor was not provided any factual information regarding any inquiry as to the sexual abuse of the children and no qualified opinion of any facts derived therefrom. Thus no accurate conclusion could properly be drawn. We, therefore, reverse the issue of Steven’s unsupervised visitation, and remand this case for further proceedings consistent with this opinion.
III. Steven’s Request for Attorney’s Fees Regarding Allegations of Sexual Abuse
*482 ¶ 41. Steven also claims that the chancellor erred in failing to make a formal ruling that he did not abuse the children. He argues that the chancellor additionally erred in failing to adopt his proposed findings of fact regarding child abuse, and that the chancellor also erred in failing to award him attorney’s fees. As previously stated, we reverse the issue of child custody including Steven’s unsupervised visitation based on our finding that: the record fails to reflect that guardian ad litem possessed qualifications to render opinions as to whether child sexual abuse occurred or not; the guardian ad litem’s opinion lacked factual basis as to that issue; and the guardian ad litem failed to provide for or seek qualified assistance to obtain an appropriate inquiry of the children into to such matter.
¶ 42. Since we remand this issue for appropriate consideration, we need not address Steven’s request for attorney’s fees at this time. However, we note that Mississippi Code Annotated section 93-5-23 (Supp.2009) allows the chancery court, on its own motion, to grant a continuance in custody cases where allegations of child abuse arise, in order to allow DHS to investigate the allegations. Additionally, section 93-5-23 provides that attorney’s fees are only appropriate where the child abuse allegations are “without foundation.” Here, in finding an award of attorney’s fees not warranted, the chancellor explained that Rachel’s concerns were well-founded, because on the witness stand, Steven admitted to the underlying behavior investigated by the guardian ad litem. In short, the chancellor found ample foundation in the following: Steven’s admissions on the stand; his continuing practice of bathing Sarah even after the guardian ad litem’s first report; and his continuing to help Sarah bathe even after the court instructed both parents that the children were of sufficient age to bathe themselves.
IV. Award of Attorney’s Fees to Rachel
¶ 43. Steven argues that the chancellor erred in awarding attorney’s fees in the amount of $10,000 to Rachel. Steven asserts that Rachel never provided the court with bills or time sheets, and there was no testimony from Rachel’s attorney establishing the basis for the requested fees.
¶ 44. This Court applies an abuse of discretion standard when reviewing the award of attorney’s fees by the chancellor. Scurlock v. Purser, 985 So.2d 362, 364(¶ 4) (Miss.Ct.App.2008). “Attorneyt’s] fees are not generally awarded unless the party requesting such fees has established the inability to pay.” Creekmore v. Creekmore, 651 So.2d 513, 520 (Miss.1995). Additionally, we note that “where the record shows an inability to pay and a disparity in relative financial positions of the parties, there is no error in awarding attorney’s fees.... [and][t]he record must reflect the requesting spouse’s inability to pay his or her own attorney’s fees.” Bates v. Bates, 755 So.2d 478, 482(¶ 11) (Miss.Ct.App.1999) (citations omitted).
¶ 45. The record reflects that Rachel is employed as a registered nurse, and her current take-home income is $2,600 a month. We note that she also provided the court with a Rule 8.05 financial statement.[10] Although no exact monetary figure could be gleaned from the record or trial testimony as to how much money Steven lost gambling, we observe that it was a substantial amount. Rachel testified that she had borrowed money from her mother, and also shopped at garage sales in an attempt to alleviate the family’s fi *483 nancial burden. We find that Rachel’s 8.05 financial statement, coupled with her testimony at trial concerning her income, provided sufficient evidence to support the chancellor’s award of attorney’s fees.
¶ 46. In addition, the chancellor’s final judgment observes that:
Attorney[’s] fees were incurred in order to prove matters which [Steven] denied but could have admitted and in fact had admitted some of the items in his CO-PAC records. This Court agrees that [Steven] improperly denied some admissions, and attorney[’s] fees were incurred in order to prove what had been denied. [Rachel] also wants [Steven] to pay the costs associated with the deposition (1291.00) of his sister, [Ann Jones]. [Rachel] makes this request as [Steven] intended to call his sister as a witness on his behalf but at her deposition she raised attorney-client privilege as to many of the questions asked by plaintiff’s counsel.... [Rachel] is entitled to an award of $10,000.00 in attorneyf’s] fees for [Steven]’s improper denial of some Requests for Admissions and the deposition of his sister [Ann Jones].
We cannot find that the chancellor abused her discretion in awarding Rachel attorney’s fees, and we affirm the award. This issue is without merit.
¶ 47. In her appellee brief, we note that Rachel requests attorney’s fees for the services rendered in connection with her defense of this appeal. The Mississippi Supreme Court “has generally awarded attorney’s fees on appeal in the amount of one-half of what was awarded in the lower court.” Grant v. Grant, 765 So.2d 1268, 1268(¶ 19) (Miss.2000) (citation omitted). However, Rachel has not presented evidence of the fees charged by her attorney or the amount of work involved in defending this appeal. Therefore, we find that she is not entitled to appellate attorney’s fees. See Monroe v. Monroe, 745 So.2d 249, 253(¶ 18) (Miss.1999).
V. Admission of Steven’s COPAC Records Into Evidence
¶ 48. While we find the chancellor’s grant of divorce on the stated ground was supported by substantial evidence, we will address the remaining errors raised. Steven alleged that the chancellor erred in admitting his COPAC records into evidence, arguing that the record custodian’s authentication of the records did not render the records admissible in the absence of someone who could interpret the records. Steven objected to the admission of these records at trial, but the chancellor overruled the objection, stating that the records would be admitted under the Mississippi Rule of Evidence 803(6) business-records exception.
¶ 49. “This Court grants a high degree of deference to the trial court’s decision to suppress or admit evidence and will not find error absent a clear abuse of discretion resulting in prejudice.” Cassibry v. Schlautman, 816 So.2d 398, 403(¶ 17) (Miss.Ct.App.2001).
¶ 50. Rule 803(6) allows the admission of:
[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11).
Mississippi Rule of Evidence 901(a) establishes that “[t]he requirement of authenti *484 cation or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims.” One possible method of authentication is to have a knowledgeable witness testify that the “matter is what it is claimed to be.” M.R.E. 901(b)(1).
¶ 51. At trial, Bridget Sessions, director of medical records for COPAC, stated that she served as the custodian of all COPAC records, and testified as to the authenticity of Steven’s COPAC records. She also testified as to COPAC’s regular practice of maintaining their medical records. We note that the chancellor and the parties were already aware of the records since the guardian ad litem had used the records to compile her report for the court, and since Steven’s COPAC records were available to both parties. We find no abuse of discretion in the chancellor’s admission of the records, as they fell within Rule 803(6) and were properly authenticated.
VI. Expert Witness Testimony
¶ 52. Steven’s final assertion of error asserts that Rachel’s own treating therapist, Dr. Glaze, should not have been allowed to testify as an expert witness. Steven claims that Dr. Glaze was not offered as an expert in any specific area of expertise that would be helpful to the trier of fact, and he submits that Rachel failed to adequately qualify Dr. Glaze as an expert witness under Mississippi Rule of Evidence 702.
¶ 53. We review a chancellor’s decision to accept expert testimony for an abuse of discretion. Univ. Med. Ctr. v. Martin, 994 So.2d 740, 745(¶ 18) (Miss.2008). The supreme court has stated that “the acceptance or refusal of expert testimony falls within the sound discretion of the trial court and that this Court will only reverse a trial judge’s decision if it was ‘arbitrary and clearly erroneous.’ ” Id. (quoting Poole v. Avara, 908 So.2d 716, 721(¶ 8) (Miss.2005) (citation omitted)). This Court has also held that “[a] trial judge’s decision as to whether a witness is qualified to testify as an expert is given the widest possible discretion.” Univ. of Miss. Med. Ctr. v. Pounders, 970 So.2d 141, 146(¶ 16) (Miss.2007).
¶ 54. In Daubert, 509 U.S. at 589, 113 S.Ct. 2786, the controlling case regarding expert testimony, the United States Supreme Court set forth that a trial judge must ensure that expert testimony is relevant and reliable. In addition, the Court stated that expert testimony is relevant if it “assist[s] the trier of fact to understand or determine a fact in issue.” Id. at 591, 113 S.Ct. 2786. However, the United States Fifth Circuit Court of Appeals has clarified that “most of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.” Martin, 994 So.2d at 746(¶21) (quoting Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir.2000)).
¶ 55. In the present case, Rachel’s counsel laid a proper evidentiary foundation and presented Dr. Glaze as an expert in counseling and therapy, and Steven’s counsel conducted a voir dire of Dr. Glaze. Based on the record before her, the chancellor then accepted Dr. Glaze as an expert in counseling and therapy, and we find no abuse of discretion in the chancellor’s acceptance of Dr. Glaze as an expert or in the admission of her testimony. Dr. Glaze is a licensed professional counselor who has been employed as a staff therapist with Shepherd’s Staff since 1984. She possesses a Master’s degree in counseling, and she had obtained additional graduate level hours in marriage and family therapy. Dr. Glaze counseled Rachel approximately twenty-five times from October *485 2006 through the day of trial. She testified as to the overall health and well-being of Rachel, and Dr. Glaze also stated that based on her sessions with Rachel, she found the Joneses’ marriage to be unhealthy for Rachel.
¶ 56. Again and in summary, after reviewing the record, we find that the chancellor did not abuse her discretion in allowing Dr. Glaze to testify as an expert witness. This issue is without merit.
¶ 57. In finding substantial evidence in the record supporting the chancellor’s decision to grant the divorce on the ground of habitual cruel and inhuman treatment, we affirm the chancellor’s judgment of divorce. We reverse the chancellor’s judgment as to custody and visitation and remand the case for further consideration consistent with this opinion.
¶ 58. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING AND ISHEE, JJ., CONCUR. ROBERTS, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. BARNES AND MAXWELL, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION. LEE, P.J., NOT PARTICIPATING.

. By prior order of this Court, fictitious names have been used for the parties in this case to protect the identity of the minor children.

. Fictitious names are also used for the minor children of the parties.

. The parties did not separate into different residences at that time because of Steven’s refusal to leave the marital home. After the temporary hearing, which was held on March 22, 2007, the chancellor ordered Steven to leave the home.

. The parties’ real names were used in the chancellor’s original opinion, but have been substituted with the fictitious names for the purposes of this opinion.

. Rachel alleged in her complaint that she was entitled to a divorce on the ground of habitual cruel and inhuman treatment and, alternatively, on the ground of irreconcilable differences. Steven answered the complaint and denied that Rachel was entitled to a divorce on any ground. He even denied that the parties were separated. Therefore, the only logical conclusion to be drawn is that Steven wants to continue the marital relationship which his wife finds to be irretrievably broken. Surely, the parties know that they can seek a divorce on the ground of irreconcilable differences, and if they had been able to agree that the marriage should come to an end, they likely would have acquired the divorce on that ground.

. Sarah complained that Steven scrubbed her too hard, and Rachel asserts that Steven referred to washing Sarah in this fashion as "flossing” her.

. While Steven objects to the testimony of Rachel’s sister, Brooke Daniel, her testimony corroborates Rachel's emotional state of repugnance regarding Steven's behavior, and rebuts the charge of fabrication. Steven also objected to the testimony of Rachel’s treating therapist.

. The record reflects that Steven was diagnosed with gonorrhea as a teen. He also admitted to relations with about one hundred sexual partners.

. These allegations were raised by Rachel's counsel as concerns, and not as allegations of sexual abuse. We note that the record reflects the chancellor found that the bathing ritual was verified by the guardian ad litem and admitted by Steven. Once notified of these concerns, the chancellor, upon her own motion, appointed the guardian ad litem to investigate the allegations. This Court makes no finding or comment as to whether the allegations possess merit or are substantiated. Rather, we remand to the chancellor to determine this factual matter based upon competent evidence.

. See Uniform Chancery Court Rule 8.05.